STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 06-623


STATE OF LOUISIANA

VERSUS

LISA LANDRY JOHNSON


**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 4985-05
HONORABLE G. MICHAEL CANADAY, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Michael G. Sullivan, Elizabeth A. Pickett, and Billy Howard Ezell, Judges.


**AFFIRMED.**

**John Foster DeRosier**
**Fourteenth Judicial District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Edward Kelly Bauman**
**Louisiana Appellate Project**
**P. O. Box 1641**
**Lake Charles, LA 70602-1641**
**(337) 491-0570**
**Counsel for Defendant/Appellant:**
**Lisa Landry Johnson**

**EZELL, JUDGE.**

On February 24, 2005, the Defendant, Lisa Landry Johnson, was charged in an indictment with second degree murder, a violation of La.R.S. 14:30.1. The Defendant entered a plea of not guilty on March 28, 2005.

Trial of this matter began on February 7, 2006 and on February 13, 2006 the jury returned a verdict of guilty. A motion for post-verdict judgment of acquittal was filed on February 16, 2006 and denied by the court on February 17, 2006. On February 17, 2006, the Defendant was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence.

A motion for appeal and designation of record was filed on March 14, 2006. The Defendant is now before this court asserting three assignment of errors. Therein, the Defendant contends there was insufficient evidence to convict her of second degree murder, the trial court erred in denying her motion for post-verdict judgment of acquittal, and the trial court erred in denying the challenge for cause regarding prospective juror Dudley and in granting the State's challenge for cause regarding prospective juror Lilly.

## FACTS

The Defendant stabbed her husband, Jerry Johnson, on December 30, 2004. Johnson died as a result of his injuries.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by the court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

First, the record does not indicate that the trial court advised the Defendant of the prescriptive period for filing post-conviction relief as required by La.Code

1

Crim.P. art. 930.8. Thus, we find the trial court should be directed to inform the Defendant of the provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings. *State v. Roe*, 05-116 (La.App. 3 Cir. 6/1/05), 903 So.2d 1265, *writ denied*, 05-1762 (La. 2/10/06), 924 So.2d 163.

### ASSIGNMENT OF ERRORS NUMBER ONE AND TWO

In her first assignment of error, the Defendant contends the verdict of the jury was contrary to the law and evidence, as there was insufficient evidence, when viewed in the light most favorable to the prosecution, for the jury to find her guilty of the crime charged beyond a reasonable doubt. In her second assignment of error, the Defendant contends the trial court erred in denying her motion for post-verdict judgment of acquittal. Inasmuch as these two assignment of errors are interrelated, they will be addressed together.

> When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts are controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *See State v. Captville*, 448 So.2d 676, 678 (La.1984). That standard dictates that to affirm the conviction the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that the State proved all elements of the crime beyond a reasonable doubt. *State v. Johnson*, 03-1228, p. 4 (La.4/14/04), 870 So.2d 995, 998; *Captville*, 448 So.2d at 678.

*State v. Spears*, 05-964, p. 2 (La. 4/4/06), 929 So.2d 1219, 1222.

Similarly, under La.Code Crim.P. art. 821(B), a post-verdict judgment of acquittal shall be granted only if the court finds that the evidence, viewed in the light most favorable to the State, does not reasonably permit a finding of guilty.

2

The Defendant was found guilty of killing her husband, Jerry Johnson, on December 30, 2004. On December 29, 2004, the Defendant, Jerry, Eric Bledsoe, and Sara Landry, the Defendant's sister, went to Leesville to visit Eric's friend. The group left the Defendant's apartment between 7:00 and 8:30 p.m. On the way, the group stopped for alcoholic beverages and food. Sara testified that during the trip to Leesville, the Defendant and Jerry argued.

The group left Leesville at approximately 11:00 p.m. or 12:00 a.m. Jerry drove the group home and, during the drive, he and the Defendant, who was in the front seat of the car, argued. When the group arrived home, the Defendant and Jerry were still arguing. Eric testified that he saw Jerry, who was still seated in the car, throw a Styrofoam cup filled with alcohol at the Defendant. Sara testified that when Jerry threw the cup he hit the Defendant in the ear with his fist. However, in her statement to police, Sara merely indicated Jerry had thrown the cup. Eric testified that the Defendant then got out of the car, said no "'MF' hits me," and ran into the apartment. Eric and Sara testified that Jerry then ran after her. Sara additionally testified that while the Defendant and Jerry were in front of the apartment door, she saw the two hit each other. However, in her statement to police, Sara stated that the Defendant pushed Jerry, who then attempted to push the Defendant off him.

Sara and Eric remained at the car while the Defendant and Jerry went into the apartment. Joshua Landry, the Defendant's brother, was asleep when the Defendant and Jerry entered the apartment, but was awakened by the Defendant, who was talking loudly and complaining that Jerry hit her. Joshua testified that the Defendant kept asking Jerry to leave and he refused. Jerry then sat down on the couch, and the argument continued. Joshua further testified that at some point the Defendant went into the kitchen and came back with four knives. At that time, Jerry was still sitting

3

on the couch. Once armed with the knives, which she held down by her sides, the Defendant continued to tell Jerry to leave and stated, "If you don't get out, I'm gonna cut you." Joshua testified that at that time, Jerry walked up to the Defendant, opened up his arms, and told the Defendant to "do it." The Defendant then stabbed Jerry. Once Jerry was stabbed, he said it did not hurt, began walking, and then fell to the floor.

Sara testified that she entered the apartment approximately five to ten minutes after Jerry and the Defendant. At that time, Jerry was walking around and the Defendant was standing in the doorway talking to Joshua about getting Jerry out of the apartment. Sara testified that Jerry finally sat down on the couch and said he was not leaving. The Defendant then informed Jerry that she would call the police and walked into the kitchen. When the Defendant returned from the kitchen, she had knives in her hand. Sara testified that she told the Defendant to put the knives down then Jerry stood up in front of the Defendant and said, "I dare you." The Defendant then stabbed Jerry. Sara testified that Jerry subsequently fell to the floor and the Defendant continued to tell him to leave the apartment. Sara further testified that when she told the Defendant Jerry was going to die, the Defendant said, "I don't care."

Eric was the last to return to the apartment. He testified that once inside the apartment, he heard a good deal of screaming and saw Jerry begin to stagger. Eric caught Jerry as he began to fall and the two walked toward the kitchen. At that time, Jerry fell to the floor. Eric testified that after Jerry was stabbed, the Defendant spoke words "intending that she didn't care" that she had stabbed him. Eric further testified that the Defendant's attitude did not change once police arrived.

4

Police and emergency medical personnel responded to the call, arriving at approximately 1:20 or 1:30 a.m. Officer John Thacker testified that the Defendant told him, "He hit me with a drink. We continued arguing. When we got home I told him to leave. He said he wasn't leaving. I grabbed some knives, told him to get out." "He stood up and said, 'Do what you got to do; I'm not leaving,' and I stabbed his ass."

Officer Scott Willson testified that the Defendant said she and Jerry argued over a drink he threw on her. Jerry then sat on the couch and the two continued to argue. At some point, the Defendant went into the kitchen, grabbed some steak knives, and went back into the living room. The argument continued, as the Defendant wanted Jerry to leave the apartment and he refused to do so. Jerry eventually stood up, and the two were face to face. At that time, the Defendant told Jerry she wanted him to leave and he said he was not leaving. More words were exchanged, and Jerry said, "Do what you got to do." The Defendant then stabbed Jerry.

Lieutenant Michael Saxby was asked about the Defendant's demeanor that night. He testified that she was "[j]ust like matter of fact, just nonchalant, just standing there like nothing was going on." Lieutenant Saxby further testified that he heard the Defendant tell other officers that she stabbed Jerry because the two were arguing and she was mad because he had thrown a drink on her. On cross-examination, Lieutenant Saxby testified that he did not know how the Defendant ordinarily behaved.

Deputy Albert Hooper testified that the Defendant was calm while talking to police and her demeanor did not change during booking.

The Defendant gave a taped statement to police in which she told them what occurred when Jerry was stabbed. The Defendant told Detective Marcus McCullough that she and Jerry argued in the car. Once they were in the apartment, Jerry hit her in the head with something. She was then in the kitchen with her back to Jerry when he charged her. At that time, the Defendant grabbed a knife and stabbed Jerry. Detective McCullough testified that through his investigation he did not find that anything occurred in the kitchen.

Jerry was taken to the hospital, where he was pronounced dead at 2:13 a.m. Dr. Terry Welke performed an autopsy on Jerry on December 30, 2004. Dr. Welke determined that Jerry had two stab wounds in the area of the left frontal chest near the collar bone. Dr. Welke opined that both stab wounds could not have occurred simultaneously. Additionally, one knife went through the upper portion of the lung and the pulmonary artery and the other through the lung only.

Joshua, Sara, Michael Davis, Officer Jason Schnake, Michael Johnson, and Kathy Walker testified regarding past incidents of physical violence and arguments between the Defendant and Jerry. Although the Defendant discusses the incidents of abuse in brief to this court and indicates it is sufficient to cause the verdict of second degree murder to be reduced to manslaughter, we have not included that testimony in this opinion, as we feel it is not relevant to the issues in these assignment of errors. Additionally, the Defendant did not assert the defense of self-defense.

The Defendant was convicted of second degree murder, which is the killing of a human being when the offender has the specific intent to kill or inflict great bodily harm. La.R.S. 14:30.1. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10. This court

6

noted in *State v. Robertson,* 98-883 (La.App. 3 Cir. 12/9/98), 723 So.2d 500, *writ denied,* 99-658 (La. 6/25/99), 745 So.2d 1187, that, specific criminal intent need not be proven as fact but may be inferred from the circumstances of the case and actions of the defendant.

In order to convict the Defendant of second degree murder, the State had the burden of proving the Defendant had the specific intent to kill or inflict great bodily harm upon Jerry Johnson.

In *State v. Overton*, 596 So.2d 1344 (La.App. 1 Cir.), *writ denied*, 599 So.2d 315 (La.1992), the defendant and the victim fought at a convenience store and each then left. The victim later armed himself and went to the motel where the defendant was staying. While the victim was in his truck in the parking lot of the motel, the defendant approached the vehicle and began to argue with the victim. A fight then ensued. The defendant threatened to cut the victim then reached into the truck and stabbed the victim at least twice. The victim died as a result of his injuries. The defendant was subsequently convicted of second degree murder.

On appeal, the court found that "[t]he fact that the defendant reached into the truck and stabbed the victim in the chest with a pocketknife indicates a specific intent to kill or to inflict great bodily harm. *Id*. at 1357.

The Defendant in the case *sub judice* argues that because she did not believe the police when she was told Jerry was dead, she did not have the specific intent to kill or cause great bodily harm. The Defendant also notes that Jerry stated that his injury did not hurt.

Testimony indicates the Defendant stabbed Jerry twice after telling him that if he did not leave she would cut him and retrieving four knives from the kitchen. We find that stabbing someone in the left chest near the heart is indicative of the specific

7

intent to at least inflict great bodily harm, if not the specific intent to kill. Accordingly, a rational trier of fact could have found that the State proved the elements of second degree murder beyond a reasonable doubt.

We will now discuss whether the evidence supports a conviction of manslaughter. Manslaughter is defined in part as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31(A)(1).

> As explained by the Louisiana Supreme Court in *State v. Snyder*, 98-1078 (La.4/14/99), 750 So.2d 832, "sudden passion" and "heat of blood" are not elements of manslaughter. "Rather, they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors." *Id*. at p. 4, 837-38. If a defendant establishes, by a preponderance of the evidence, the presence of these mitigating factors, he or she is entitled to a verdict of manslaughter. *Id. See also State v. Lombard*, 486 So.2d 106 (La.1986).

*State v. Brown*, 00-1021, p. 6 (La.App. 3 Cir. 1/31/01), 780 So.2d 536, 540, *writ denied*, 01-912 (La. 2/1/02), 807 So.2d 854.

Regardless of the words exchanged,"mere words or gestures, however offensive or insulting, will not reduce homicide from murder to manslaughter." *State v. Massey*, 535 So.2d 1135, 1143 (La.App. 2 Cir. 1988). *See also State v. Mitchell*, 39,202 (La.App. 2 Cir. 12/15/04), 889 So.2d 1257, *writ denied*, 05-132 (La. 4/29/05), 901 So.2d 1063, quoting *State v. Conerly*, 48 La.Ann. 1561, 21 So.2d 192 (1897)). "Further, an argument alone will not be a sufficient provocation in order to reduce a murder charge to manslaughter. *State v. Miller*, 98-642 (La.App. 3 Cir. 10/28/98); 720 So.2d 829, citing *State v. Gauthier*, 546 So.2d 652 (La.App. 4 Cir.1989)." *State*

8

*v. Charles*, 00-1611, p. 4 (La.App. 3 Cir. 5/9/01), 787 So.2d 516, 519, *writ denied*, 01-1554 (La. 4/19/02), 813 So.2d 420.

In reviewing the Defendant's claim, this court must determine "if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence." *State v. Hamilton*, 99-523, p. 7 (La.App. 3 Cir. 11/3/99), 747 So.2d 164, 168.

The evidence in the case *sub judice* indicates the Defendant and Jerry argued on their way to and from Leesville. Jerry then threw a cup at the Defendant. Although Sara testified that Jerry hit the Defendant in the ear in the car and the two hit each other in front of the apartment before entering, that testimony is questionable, as it conflicts with the statement she gave to police and with Eric's testimony. Once inside the apartment, the Defendant and Jerry argued for at least ten to fifteen minutes while Jerry initially walked around the apartment then sat on the couch. While Jerry was seated, the Defendant went into the kitchen and retrieved four knives. The Defendant then told Jerry she would cut him if he did not leave. Jerry proceeded to stand up and tell the Defendant to do it or "I dare you." The Defendant then stabbed Jerry. After she stabbed Jerry she continued to demand that he leave the apartment and made statements indicating that she was not concerned that Jerry might die.

In *State v. Shanks*, 97-1885 (La.App. 1 Cir. 6/29/98), 715 So.2d 157, the victim went to the defendant's home to collect money the defendant owed him for a prior purchase of marijuana. Once inside the defendant's trailer, the victim began demanding money and an argument ensued. The victim struck the defendant once on the left side of the cheek and once on the left side of the neck. As the victim turned to walk out the door, the defendant picked up a shotgun and fired one time at waist

9

level. During his statement to police, the defendant stated, "[N]o m_ _ _ _r f_ _ _ _r is going to come in my house and hit me. . . ." *Id*. at 162. On appeal, the defendant argued that the evidence was insufficient to prove second degree murder. Alternatively, the defendant argued that the court should find that the evidence supported a conviction of manslaughter. The court concluded the following:

> Based upon the physical evidence, the crime scene photographs, defendant's admission (that he picked up the 12 gauge shotgun and fired it in the direction of the victim's backside at close range from waist level as the victim was exiting the door), and defendant's pounding the table and telling the police that "no m_ _ _ _ _r f_ _ _ _r is going to come in my house and hit me," any rational trier of fact could have concluded beyond a reasonable doubt that this shooting was not accidental, but rather one with the specific intent to kill *or* inflict great bodily harm. In returning a guilty verdict, it is obvious the majority of the jury concluded that the evidence proved the requisite element of specific intent for second degree murder. Once that conclusion was reached, it foreclosed the alternative theory of a manslaughter without specific intent based on the commission of the offense of illegal use of a weapon. This left the jurors with the remaining decision of determining whether the homicide should be reduced from second degree murder to manslaughter committed in sudden passion or heat of blood. It is obvious the majority of the jury concluded this homicide was not committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection; or that, if there was such provocation, defendant's blood had actually cooled, or an average person's blood would have cooled, at the time the offense was committed. Consequently, we find that, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the mitigating factors were not established by a preponderance of the evidence and that there was proof, beyond a reasonable doubt and to the exclusion of any reasonable hypothesis of innocence, that this homicide was a second degree murder.

*Id*.

In *State v. McCray*, 621 So.2d 94 (La.App. 2 Cir. 1993), the defendant went to the victim's home armed with a pistol. He went into one of the bedrooms and left his gun there, but kept the clip. The defendant then returned to the living room and began talking to the victim about their relationship. When the victim told the defendant she did not love him anymore, he hit her in the head several times with the

10

clip.  The defendant then went to the bedroom, retrieved the gun, and inserted the clip.  The defendant returned to the living room and hit the victim over the head with the gun several times saying, "Well, I tell you what, b_ _ ch, if I can't have you, can't nobody have you." *Id*. at 96.  The defendant then aimed the gun at the victim and fired.  The victim's brother grabbed the defendant's hand, causing the bullet to go through the ceiling.  The defendant fired a second time, and the bullet struck the victim in the abdomen.  The defendant was convicted of attempted second degree murder.  On appeal, the defendant argued that the evidence supported a verdict of attempted manslaughter.  The court found that the defendant had ample time to reflect on his actions because he went into another room of the house to retrieve his gun.

In the present case, we find the verdict of guilty of second degree murder should stand.  The stabbing occurred at least ten to fifteen minutes after Jerry threw a cup at and/or hit the Defendant.  Based on the cases cited herein, Jerry's acts were too far removed from the stabbing to support the provocation element necessary for a conviction of manslaughter.  Subsequently, Jerry and the Defendant were arguing; however, an argument alone is not sufficient provocation to support a verdict of manslaughter.  Additionally, the Defendant left the area of the living room and went into the kitchen to retrieve the knives she used to stab Jerry.  Based on these facts, we find the Defendant failed to establish the mitigating factors necessary to support a verdict of manslaughter by a preponderance of the evidence.  Additionally, based on the cases cited herein, any arguments or physical abuse that occurred prior to the date of the incident, would not be sufficient provocation for manslaughter.

Accordingly, these assignments of error lack merit.

## ASSIGNMENT OF ERROR NUMBER THREE

_____In her third assignment of error, the Defendant contends the trial court erred in denying her challenge for cause regarding prospective juror Dudley and in granting the State's challenge for cause regarding prospective juror Lilly.

DUDLEY

The Defendant argues that Dudley was not properly rehabilitated, as he never retracted his statement that he would lean toward law enforcement. The State argues that this issue is not properly before the court, as the Defendant's objection was not specific enough under La.Code Crim.P. art. 800 to preserve the issue for review.

Louisiana Code of Criminal Procedure Article 800(A) provides as follows:

A defendant may not assign as error a ruling refusing to sustain a challenge for cause made by him, unless an objection thereto is made at the time of the ruling. The nature of the objection and grounds therefor shall be stated at the time of objection.

The Defendant challenged Dudley for cause because, if selected to serve on the jury, he might miss a scheduled court hearing and he stated that he would probably err on the side of believing law enforcement. The Defendant clearly stated her basis for the challenge for cause at issue and objected to the court's denial of her challenge for cause. Therefore, we find this issue is properly before the court. We will now discuss whether the trial court improperly denied the Defendant's challenge for cause.

Prejudice is presumed when a trial court erroneously denies a challenge for cause and the defendant ultimately exhausts his peremptory challenges. *State v. Robertson*, 92-2660, p. 3 (La.1/14/94), 630 So.2d 1278, 1280. This is because an erroneous ruling depriving an accused of a peremptory challenge violates his substantial rights and constitutes reversible error. *State v. Cross*, 93-1189, p. 6 (La.6/30/95), 658 So.2d 683, 686. Therefore, to prove there has been an error warranting reversal of a conviction and sentence, a defendant need only show: (1) the trial court's erroneous denial of a challenge for cause; and (2) the use of all of his peremptory challenges. *Cross*, 93-1189 at p. 6, 658 So.2d at 686; *Robertson*, 92-2660 at p. 3, 630 So.2d at 1281.

12

. . . Thus, as a starting point, we note that under La.C.Cr.P. art 797, a defendant may challenge a juror for cause if:

(2) the juror is not impartial, whatever the cause of his partiality. An opinion or impression as to the guilt or innocence of the defendant shall not of itself be sufficient grounds for challenge to a juror, if he declares, and the court is satisfied, that he can render and impartial verdict according to the law and the evidence; . . .

(4) The juror will not accept the law as given to him by the court.

. . . .

Generally, an individual who will unquestionably credit the testimony of law enforcement officers over that of defense witnesses is not competent to serve as a juror. *State v. Allen*, 380 So.2d 28, 30 (La.1980); *State v. Jones*, 282 So.2d 422, 431 (La.1973). However, a mere relationship between a prospective juror and a law enforcement officer is not of itself grounds to strike the juror for cause. *State v. Anthony*, 98-0406, p. 24 (La.4/11/00), 776 So.2d 376, 392; *State v. Smith*, 430 So.2d 31, 38 (La.1983). Additionally, a prospective juror's seemingly prejudicial response is not grounds for an automatic challenge for cause, and a trial judge's refusal to excuse him on the grounds of impartiality is not an abuse of discretion, if after further questioning the potential juror demonstrates a willingness and ability to decide the case impartially according to the law and evidence. *State v. Lee*, 559 So.2d 1310, 1318 (La.1990); *State v. Baldwin*, 388 So.2d 664, 671-72 (La.1980), *cert. denied*, 449 U.S. 1103, 101 S.Ct. 901, 66 L.Ed.2d 830 (1981); *Allen*, 380 So.2d at 30. But, a challenge for cause should be granted, even when a prospective juror declares his ability to remain impartial, if the juror's responses as a whole reveal facts from which bias, prejudice or inability to render a judgement according to law may be reasonably implied. *State v. Hallal*, 557 So.2d 1388, 1389-90 (La.1990).

*State v. Kang*, 02-2812, pp. 3-5 (La. 10/21/03), 859 So.2d 649, 651-53(second omission in original).

The Defendant used all twelve of her peremptory challenges prior to the selection of the twelfth juror. Therefore, we find the court must ascertain whether the trial court erroneously denied the Defendant's challenge for cause regarding prospective juror Dudley.

Dudley informed the trial court that he worked for the Louisiana Department of Probation and Parole. He was then questioned as follows:

13

THE COURT:

And the same type of questions, the fact that you are involved in law enforcement do you have a predisposition in this matter?

PROSPECTIVE JUROR:

No, not really. I know everyone here but I think I could judge the case on its facts.

THE COURT:

Do you think you could be fair and impartial?

PROSPECTIVE JUROR:

I think so.

The questioning continued as follows:

THE COURT:

Would you automatically vote in favor of a law enforcement position even if the evidence wasn't there?

PROSPECTIVE JUROR:

I'm sure I would be biased to some extent, maybe not intentionally, but I think I would vote on the facts, but I would probably lean more towards law enforcement because I know all the officers involved.

THE COURT:

You heard the witness list and you know most of them?

PROSPECTIVE JUROR:

Yeah, I worked with them or I have worked with them.

Later, Dudley was questioned by the State as follows:

MS. WILSON:

Thank you sir.

Mr. Dudley, basically the same question I was asking Ms. Dally. I think you pretty much know all of the participants, because as a

14

probation officer you have to work with your client's prosecutor, as well as the defense attorney, to try to resolve things; correct?

PROSPECTIVE JUROR:

Yes.

MS. WILSON:

And the fact that you work with myself and Mr. Bergeron and other members of the defense bar, that is not going to make you favor one side or the other if you were selected as a juror in this case; is that correct?

PROSPECTIVE JUROR:

No. I could judge the facts of the case.

MS. WILSON:

Okay. Also, my husband also is a former probation and parole officer, and I think you had a working relationship with him as well; correct?

PROSPECTIVE JUROR:

Yes.

MS. WILSON:

And that would not influence you in your decision in this case; is that correct?

PROSPECTIVE JUROR:

No, it wouldn't.

Defense counsel questioned Dudley as follows:

MR. WHITE:

Okay. How do you feel about the prospect of possibly being a juror on a case where you are going to be looking intently at the matter of intent? You are going to be splitting legal hairs here possibly. Do you follow me?

PROSPECTIVE JUROR:

Well, I would have to judge it on its facts and be as neutral as possible. We all have natural bias I think, but the severity of the crime

and the sentence that she is possibly facing you would have to be neutral and look at all the facts.

The Defendant challenged Dudley for cause asserting there may be a problem, because Dudley was scheduled to be at a hearing on Friday, which could potentially involve a client of the Public Defender's Office and that client could possibly be prejudiced if Dudley were absent. The trial court stated that the situation may present a hardship, but was not a basis for cause under La.Code Crim.P. art. 797. It was then pointed out by defense counsel that Dudley sounded as though he might err on the side of believing law enforcement over civilian witnesses. However, the trial court denied the challenge for cause, noting there was no significant relationship that would influence Dudley's verdict and Dudley indicated that he would accept the law as given. The Defendant objected to the trial court's ruling. The Defendant later exercised a peremptory challenge against Dudley.

In *State v. Hallal*, 557 So.2d 1388 (La.1990), prospective juror Shirley Wilson, the wife of a fifteen-year veteran of the Vernon Parish Sheriff's Office, acknowledged the defendant was presumed innocent, the state had the burden of proof, and any impression she had about the case would have to yield to the evidence presented at trial. However, she indicated she would tend to believe the state's police witnesses because she knew them. She further stated that although she had no close personal ties with the officers, she felt they were honest people. The supreme court held that Wilson never expressly stated that she could put aside her acquaintance with the officers, and it was not reasonable for the trial court to accept assurances that she would judge the case impartially on the evidence at trial from a juror who began with the premise that the police officers directly involved in the arrest and questioning of the defendant were telling the truth. The defendant's conviction and sentence were then reversed and vacated and the matter remanded.

16

In *State v. Jones*, 623 So.2d 877 (La.App. 1 Cir.), *writ denied*, 629 So.2d 419 (La.1993), prospective juror Bishop had been employed as an administrative assistant by the Louisiana State Police for twelve years. During voir dire, Bishop stated that she would do her best to be fair. She later indicated that her acquaintance with people in law enforcement could cause her to lean toward the state's favor. However, Bishop then informed the trial court that if the state had not proven its case she would not vote guilty and she would attempt to render the fairest verdict she could based on the facts presented. She further indicated that she would do her best to separate herself from her experiences and listen to the evidence presented. The first circuit noted that Bishop never expressly stated she could put aside her bias. The court went on to find that Bishop's statement that she would "do her best" to give the defendant a fair and impartial trial was not sufficient and reversed the defendant's convictions and sentences. *Id.* at 881.

In *State v. Paul*, 99-92 (La.App. 5 Cir. 5/19/99), 738 So.2d 1128, the defendant challenged four prospective jurors for cause. During questioning by defense counsel, prospective juror Naquin indicated that the testimony of a police officer would be more accurate than that of a non police officer because a police officer "is at a higher standard." *Id*. at 1130. Prospective juror Cooke felt the same about the testimony of a police officer. Prospective juror Nezat indicated that he felt the testimony of a police officer would be more accurate. Additionally, prospective juror Dalia stated that she would be more inclined to believe a police officer over an ordinary person. The fifth circuit noted that neither the state nor the judge attempted to rehabilitate the prospective jurors after they voiced their bias in favor of police officers and the state's case was based entirely on the testimony of police officers. The court further noted that the prospective jurors never expressly stated that they would set aside their

biases and give the defendant a fair trial. The court held that the trial court's failure to grant the defendant's challenges for cause was an abuse of discretion.

In *State v. Price*, 02-360 (La.App. 4. Cir. 4/2/03), 842 So.2d 491, *writs denied*, 03-1322 (La. 11/21/03), 860 So.2d 542 and 03-1517 (La. 12/12/03), 860 So.2d 1151, the defendant's challenge for cause regarding prospective juror Saizan was denied. During voir dire, Saizan indicated that she would probably find a police officer a credible witness. She further indicated that it was possible that she could not hear the case without any bias in favor of believing the police witnesses. Saizan then stated that she would give the testimony of all witnesses equal weight and would look at the testimony of each witness individually in order to determine whether their testimony was worthy of belief. The trial court subsequently denied the defendant's challenge for cause. The fourth circuit then noted that none of the police officers that Saizan knew testified at trial. Additionally, her responses to the trial court's questioning showed that she could fairly evaluate the credibility of all witnesses and judge them on equally. The court then distinguished the case from *Hallal*, 557 So.2d 1388, indicating there was no confession or statement given to police by the defendant in *Price*. The fourth circuit concluded that the state's burden of proof was not as directly dependent upon police credibility as it was in *Hallal*. The fourth circuit then held that the trial court did not abuse its discretion when denying the defendant's challenge for cause.

In the case *sub judice*, there were witnesses present when the Defendant stabbed Jerry and the Defendant admitted she stabbed him. Therefore, we find that, as in *Price*, 842 So.2d 491, the testimony of police officers was not crucial to the State's case. Furthermore, prospective juror Dudley was sufficiently rehabilitated, as he indicated he could be neutral and judge the facts of the case. Accordingly, we

18

find the trial court properly denied the Defendant's challenge for cause as to prospective juror Dudley.

LILLY

During voir dire, prospective juror Lilly indicted that, in his experience, he did not think a man could be the victim of domestic violence. He then indicated that, "If there is domestic violence involved, like a man and a woman, I don't think that I could go against the woman." Lilly further indicated that had his mother done something to his father while he was asleep, Lilly would have been on her side from what he saw.

The State challenged Lilly for cause alleging he was obviously biased. The trial court then excused Lilly. Defense counsel objected to the trial court's ruling.

The Defendant asserts that Lilly should have been questioned further and rehabilitated, as there was not enough evidence submitted to show that he would be biased toward the Defendant.

> [A] defendant does not have grounds to complain about the granting of a state's challenge for cause, unless the effect of the ruling is to allow the state to exercise more peremptory challenges than is allowed by law. *State v. Joe*, 28,198 (La.App. 2 Cir. 7/26/96), 678 So.2d 586, 589; *State v. Fleeks*, 26,270, (La.App. 2d Cir. 3/1/95), 651 So.2d 370; La.Code Crim.P. art. 800 B.

*State v. Green,* 98-1388, p. 12 (La.App. 3 Cir. 3/31/99), 735 So.2d 723,731, *writ denied*, 00-2904 (La. 8/24/01), 795 So.2d 323.

The record indicated that the State exercised only eleven of the twelve peremptory challenges allotted to it by La.Code Crim.P. art. 799. Thus, the Defendant's argument is without merit.

19

## CONCLUSION

The Defendant's conviction and sentence is affirmed. However, the trial court should be directed to inform the Defendant of the provisions of Article 930.8 by sending appropriate written notice to the Defendant within ten days of the rendition of this opinion and to file written proof that the Defendant received the notice in the record of the proceedings.

**AFFIRMED**.