# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## KA 09-831


**STATE OF LOUISIANA**

**VERSUS**

**WILKES LAIRD**


**********

APPEAL FROM THE
THIRTY-THIRD JUDICIAL DISTRICT COURT
PARISH OF ALLEN, NO. CR20071530
HONORABLE PATRICIA C. COLE, DISTRICT JUDGE

**********

## SHANNON J. GREMILLION
## JUDGE

**********

Court composed of Billy Howard Ezell, J. David Painter, and Shannon J. Gremillion, Judges.

**AFFIRMED.**

**James David Caldwell**
**District Attorney - Sixth Judicial District Court**
**P. O. Box 1389**
**Tallulah, La 71282**
**(318) 574-1706**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Mark Owen Foster**
**Louisiana Appellate Project**
**P. O. Box 2057**
**Natchitoches, LA 71457**
**(318) 572-5693**
**Counsel for Defendant/Appellant:**
**Wilkes Laird**

**Marty L. White**
**Terri R. Lacy**
**Asst. Attorney General**
**P. O. Box 94005**
**Baton Rouge, LA 70804**
**(225) 342-7552**
**Counsel for Plaintiff/Appellee:**
**State of Louisiana**

**Wilkes Laird**
**AVC - Cajun 2 D2**
**1630 Prison Rd**
**Cottonport, LA 71327**
**(318) 876-2891**
**Counsel for Defendant/Appellant:**
**Wilkes Laird**

**GREMILLION, Judge.**

Defendant, Wilkes Laird, was convicted by a jury of attempted manslaughter, in violation of La.R.S. 14:27 and 14:31, and possession of a firearm by a convicted felon, in violation of La.R.S. 14:95.1. He was adjudicated a second felony offender, pursuant to La.R.S. 15:529.1, and sentenced to thirty years at hard labor, without the benefit of probation, parole, or suspension of sentence on the attempted manslaughter conviction, and to fifteen years at hard labor, with a fine of $1,000, on the firearm possession charge, with the sentences to run concurrently.[1]

The brief filed by Defendant's appointed counsel alleges the trial court erred by not allowing Defendant to waive his right to counsel and represent himself in this case. Defendant's pro se brief alleges the evidence was insufficient to convict him, and the trial judge improperly denied his motion for recusal.

## FACTS

Daniel Johnson and his wife, Crystal, separated periodically, and she sometimes stayed at Defendant's home. On the evening of Monday, February 26, 2007, Daniel testified he spoke two or three times to Crystal's friend, Trista Carroll, and Defendant's nephew, Timmy Laird, on the telephone. Trista and Timmy began calling Daniel around 10:00 or 10:30 p.m. Trista told Daniel she would have Crystal write a letter telling Daniel what she wanted to do about their marriage. At one point, Daniel told Timmy on the telephone he would "bust his head." He was concerned Timmy would give drugs to Crystal. Daniel went to Defendant's home to get the letter around 11:40 p.m. He believed Crystal was living at her mother's home in Pitkin.

---

[1]Defendant was previously convicted of simple burglary and sentenced to ten years at hard labor. He was on parole at the time of the shooting in this case.

1

As Daniel approached the driveway of Defendant's home, he saw Crystal's car turning into it. He passed the driveway to give Crystal time to drop off the letter and leave, and then he returned to Defendant's home. When he turned into the driveway, he saw Crystal's car there. He exited his vehicle and left the motor running with the door open.

Daniel knocked on the front door, finding it odd that no lights were on in the trailer. No one answered the door. He left the steps and tapped on the side of the trailer, and in a loud voice, said he had just come for the letter. Daniel returned to the front door and knocked again. As he turned to leave the steps again, he heard the door rattle as if it were being opened. He turned around and saw Defendant coming through the door with a rifle over his head.

Defendant "bashed through the glass." As Daniel went around the corner of the trailer, he felt a bullet hit him in the upper chest, and he fell. He got up and ran to the back of the trailer, hearing more gunshots. As Daniel ran toward the next-door home of Defendant's mother, he felt another bullet hit his lower back, and he rolled to the ground. When he looked up, he saw Defendant coming toward him. Although Defendant was still trying to pull the trigger, the gun would not fire. Defendant "bashed [Daniel] toward the forehead," and Daniel grabbed the gun. The two men "tussled with the gun" as Daniel kept asking Defendant not to kill him. Daniel saw blood on Defendant's forehead. Defendant finally stood up, helped Daniel get up, and walked Daniel to his car, all the time telling Daniel he ought to kill him. Daniel got in his car, and Defendant went toward the porch with the gun.

As Daniel backed out of the driveway, he heard someone screaming his name, and he saw Crystal, Timmy, Trista, and Defendant on the porch. He also saw Dustin

2

Willis at the bottom of the steps, returning from Daniel's car. Daniel called the police as he drove away in his vehicle to inform them of what had happened, where he was going, what he was driving, and who shot him. Crystal also made a 911 call in which she reported shots being fired. Daniel received emergency treatment at Oakdale Community Hospital and was taken to Shreveport for emergency surgery to stop internal bleeding. While at Oakdale, Daniel identified Defendant as the person who had shot him. Dr. Peter Chu treated Daniel at the emergency room for gunshot wounds to his right chest wall and his lower back. Daniel's drug test was positive for methamphetamine.

While Daniel was in Shreveport, he learned of an attempt to serve a restraining order on him at his mother's house. Daniel had no knowledge of the restraining order when he knocked on the door of Defendant's home.

About three days prior to the incident, Daniel had been at Defendant's home talking to him about trading a truck. Defendant was cleaning a .22 rifle at the time; Daniel believed it was the same gun used to shoot him on February 26, 2007. On that occasion, Daniel asked Defendant if he was romantically involved with Crystal, and Defendant said no.

Trista Carroll's testimony was similar. She said she, Crystal, Timmy, and Defendant were inside the trailer when they heard someone knock. She looked through the blinds and told Crystal it was Daniel. Crystal locked herself in the bathroom and would not talk to Daniel. Defendant jumped up and got a long gun from on top of some cabinets. Either Defendant or Daniel kicked the door, and Defendant went outside with the gun. She heard about three shots, and then

3

Defendant came inside. Trista does not remember what happened after that, but she thinks she may have returned to Timmy's house across the road.

According to Trista, they were using a lot of cocaine and pills at Defendant's home that night—so much that she overdosed and woke up the next day in the hospital. She did not recall talking to Daniel on the telephone, but she believed Timmy talked to him. She could not say she was one hundred percent sure of the facts as she testified because of the drugs. Her testimony was not trustworthy by her own admission.

Scotty LaBorde, the Oakdale Chief of Police at the time of trial, worked as an Allen Parish Sheriff's Deputy on February 26, 2007. He received a call about shots being fired on Dovie Laird Road around 11:44 p.m. When he turned onto Dovie Laird Road, he met a vehicle with emergency flashers activated. He turned his vehicle around and stopped the other vehicle to find Crystal Johnson in it, crying and upset, with a .22 rifle on the passenger's side. Crystal blurted she had just shot her husband. Deputy LaBorde had another deputy transport Crystal to the Oakdale Police Department, and he proceeded to Defendant's residence, where he found Dusty Willis as the only person there.

Detective Chris Oakes testified that the Sheriff's Department's investigation showed the glass from the trailer's front storm door was missing, with a small amount of broken glass inside the trailer, and most of it on the exterior. The door seal was not affected as it would have been if someone had tried to damage it from the outside. Investigators also found a spent .22 shell casing on the front porch; Detective Oakes testified the casing would eject at the site where the shooter was located.

4

Detective Oakes also processed the gun involved in the incident for fingerprints. The gun, examined for latent prints, "lacked sufficient ridge detail for comparison purposes." Fingerprint testing was not performed on a pocket knife or a lighter found in the yard of Defendant's home.

On March 5, 2007, Defendant contacted Detective Mike Slaney of the Allen Parish Sheriff's Department. Detective Slaney had typed up a warrant for Defendant and had been to his residence looking for him.

The defense submitted testimony in support of the argument that Defendant was out of town at the time of the shooting. Cecil Laird, Defendant's brother, testified Defendant called him around 8:00 p.m. on the night of the incident and asked Cecil to take him to Hineston, Louisiana, to help John Lewis do some mechanic work at John's shop. Crystal was at Defendant's home when Cecil arrived. Cecil and Defendant arrived in Hineston around 9:00 p.m. Cecil dropped off Defendant, and he saw no one at the home of John Lewis, where he left Defendant. The next day, Cecil heard of the shooting on Dovie Laird Road. While Cecil testified he learned from their mother that authorities were looking for Defendant, he also testified he had no knowledge Defendant was a suspect until three or four days later when he discussed the case with Detective Slaney.

Crystal Johnson testified she and Daniel were married at the time of Defendant's trial, but she had left him about two weeks before this incident. At times Daniel was a good man, but at other times he would accuse her of doing "things that he would think of" and be verbally, mentally, and physically abusive. On the night of the incident, Crystal said she was asleep in bed at Defendant's home, and Dusty Willis was asleep in the back of the house. Someone woke her or she received a

5

telephone call that her "old man was coming down there fixing to kill everybody." Almost immediately, she heard Daniel's vehicle in the driveway. She did not see Defendant at his home that night.

When asked whether she could recall what happened, Crystal replied:

> Not really. You know, I hear people use stuff like that for an excuse, temporary—I don't know, where you can't remember, but some of my scenes are, you know, backwards, wishwashed, I don't know what come first when I try to think about it.

She testified she recalled being on Sam Cloud Road when a police officer took the gun from her, and she recalls being at the police station. She does not know how the gun came into her possession. When asked whether she shot Daniel, Crystal replied:

> You know, it doesn't matter to me, it doesn't matter who did it. You know, I sat and prayed days that he wouldn't come back from a job, pray that he would be dead maybe I wouldn't have to put up with this reaction from him anymore I could deal [sic]. If I didn't get a call from the Acadian Ambulance and telling me he has had a motorcycle wreck, pretty close to death, I had to live through that and he is still here.

When asked again whether she shot her husband, Crystal invoked her Fifth Amendment privilege.

Although Crystal testified she called 911 when she heard Daniel's vehicle approaching, the tape of the call indicates she reported shots being fired. Crystal explained "events were happening" by the time the 911 operator answered the call, and she thinks she recalls stating during the call that shots were fired. The tape recording of the call shows Crystal said she had not been outside. While she invoked her Fifth Amendment privilege when asked if she hit Daniel in the head with the gun, she said she did not chase him around the trailer, knock him down, wrestle him, or break the windows in Daniel's vehicle. She also invoked her Fifth Amendment rights when asked what she did when Daniel came to the door.

6

Patty Thompson was Crystal's foster mother from the time Crystal was thirteen. On the night of the shooting, Thompson said Daniel called her house and left a message. Around 10:30 p.m., Thompson "called Crystal and told her that Daniel was on the rampage." Crystal called Thompson from her cell phone, crying, around 11:30 p.m. Thompson did not know if Crystal said she shot Daniel, or Daniel had been shot; she thought Crystal said, "I shot Daniel."

Daniel had frequently called and come by Thompson's home during his separation from Crystal. According to Thompson, Crystal was more afraid of Daniel when they were separated than when they were together.

Defendant's alibi witness, John Lewis, testified at the preliminary examination; when he did not appear at trial in response to a subpoena, the trial court allowed his testimony from the preliminary examination to be read to the jury. John testified that Cecil Laird brought Defendant to his home in Hineston, Louisiana, before dark on the Monday of the shooting, and Defendant stayed until the next day. In a statement given to Detective Slaney on March 6, 2007, however, John had repeatedly said Defendant came to his house on a weekend. John had also told Detective Slaney that Defendant always came to John's home on his own, in a green van. But at the preliminary examination, John said he shook hands with Cecil Laird when he dropped off Defendant at John's home.

Mark Lewis, John's son and an officer with the Camp Beauregard Police, was also subpoenaed for trial and did not appear; thus, his testimony from the preliminary examination was admitted. Mark lives in a house adjacent to John's shop. He testified he saw his father and Defendant at his father's shop on either February 26 or 27, 2007, around 10:00 or 11:00 p.m., for about twenty or thirty minutes. Mark

7

saw his father and Defendant again the next morning when he left for work around 5:00 a.m. Mark testified he worked a twelve-hour shift, and Defendant was gone when he returned from work. However, Mark believed that was on a Wednesday, whereas the shooting occurred on a Monday night or very early on a Tuesday morning.

## DEFENDANT'S SELF-REPRESENTATION

At Defendant's 72-hour hearing on March 6, 2007, the trial court asked him if he could afford an attorney; Defendant responded, "no ma'am." In response to the trial court's question, "are you asking the court to appoint you one," Defendant responded, "yes, ma'am." The trial court found Defendant was indigent and appointed counsel, Judi Abrusley, for him.

Approximately twenty-six *pro se* motions appear in the record, and the record references an additional pro se motion sent to the court "on July 25, 2007 for recusal of [the trial judge]; for consideration of previously filed *pro se* motions; and for self-representation." At one point, the trial court denied Defendant's pending pro se motions because he was represented by counsel at the time. This court granted Defendant's writ application and remanded the motions for hearing pursuant to *State v. Melon*, 95-2209, p.1 (La. 9/22/95), 660 So.2d 466, 477, in which the supreme court held that the meaningful access to the courts guaranteed by the Louisiana Constitution requires the lower courts to "accept and consider filings from represented defendants in a preverdict context whenever doing so will not lead to confusion at trial."

Defendant sent Ms. Abrusley a letter advising, "you are fired." She filed a motion to withdraw as Defendant's counsel, and the court appointed another attorney,

8

John Demourelle, to represent Defendant on that date. For reasons discussed in a sidebar conference and not stated in the record, Mr. Demourelle withdrew as counsel for Defendant. The trial court then appointed Chad Guidry, who represented Defendant at trial.

After the trial, Defendant filed a "Motion for the firing of Attorney" in which he said he no longer needed Mr. Guidry as his attorney because of ineffective assistance at trial. Defendant withdrew that motion at the hearing of his motion for new trial and sentencing.

One of Defendant's pro se motions was titled "Motion to Reconsideration [sic] the Denial of Previous Motions." In that motion, Defendant erroneously stated he had not asked for counsel or requested to have counsel represent him. Defendant's rather cryptic motion nonetheless asked "that he be allowed someone to fill-in because he is (not) able to read nor write . . . [he] has enough asset to ligature, that he could hire his own counsel but choose, rather to go forward as (Pro-Se)." [Sic].

Mr. Demourelle appeared on behalf of Defendant at a hearing on a number of motions, including a motion for self-representation. When the trial court asked Defendant if he wanted to represent himself, he replied, "Well, I need somebody to represent me or counsel to sit in here cause I can't read and write the English language good." Defendant then indicated he had an eighth grade education, had no legal training or education, and had done pipeline, carpentry, and sheet metal work. Although he can read the Bible through "the power of God," he "can't spell none of it," he "can't read the English language," and he "can't read a newspaper."

Someone else wrote the pro se pleadings on Defendant's behalf. When asked why he wanted to represent himself, Defendant replied, "Well cause—cause I just

9

don't—nobody else is trying to help me. . . ." Defendant did not understand the dangers of representing himself or the concept of reasonable doubt. The trial court was not satisfied Defendant understood the consequences of waiving his right to counsel, and did not believe he had the ability to adequately present a defense. When the trial court denied Defendant's motion for self-representation, Defendant asked, "Your Honor, could you appoint me somebody that will help me[?]"

## PRO SE ASSIGNMENT OF ERROR NUMBER ONE

In his first pro se assignment of error, Defendant contends the evidence was insufficient to sustain his conviction because the State did not prove his presence at the scene of the shooting or that, if he was present, he was not acting in self-defense. "When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first determine the sufficiency of the evidence." *State v. Hearold*, 603 So.2d 731, 734 (La.1992). Thus, we address Defendant's first pro se assignment of error before the others.

The standard of review in a sufficiency of the evidence claim is "whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged." *State v. Leger*, 05-11, p. 91 (La. 7/10/06), 936 So.2d 108, 170, *cert. denied*, 549 U.S. 1221, 127 S.Ct. 1279 (2007), *citing Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979); *State v. Captville*, 448 So.2d 676, (La.1984). "In making such a determination, a reviewing court is not called upon to decide whether it believes the witnesses or whether the conviction is contrary to the weight of the evidence." *State v. Smith*, 600 So.2d 1319, 1324 (La.1992).

10

Manslaughter is a homicide that would be first or second degree murder, and thus requires the specific intent to kill, but for "sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection." La.R.S. 14:31; *State v. Smith*, 07-468 (La.App. 3 Cir. 10/31/07), 969 So.2d 694, *writ denied*, 07-2484 (La. 5/16/08), 980 So.2d 707. "Sudden passion" and "heat of blood" are not elements of manslaughter, but rather, "they are mitigatory factors in the nature of a defense which exhibit a degree of culpability less than that present when the homicide is committed in the absence of these factors." *State v. Johnson*, 06-623, p. 7 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, 702, *writ denied*, 06-3024 (La. 9/14/07), 963 So.2d 995. It stands to reason that attempted manslaughter is an attempted homicide with those mitigating factors. La.R.S. 14:27. *See*, *e.g. State v. Brumfield*, 04-552 (La.App. 5 Cir. 10/26/04), 887 So.2d 554. Defendant was charged with and tried for attempted second degree murder. The jury returned a verdict of "guilty of attempted manslaughter," finding evidence of provocation giving rise to the mitigatory factors of "sudden passion" or "heat of blood."

Defendant argues, however, that the evidence was insufficient to place him at the scene of the shooting. The victim, Daniel Johnson, testified Defendant shot him, hit him in the head with the rifle, and wrestled with him on the ground. Trista Carroll corroborated that version of the events, but admitted she was under the influence of drugs at the time. Defendant testified he was at John Lewis' home in Hineston, Louisiana, at the time of the shooting. Although the rifle involved was found in Crystal Johnson's possession, and Crystal told Deputy Laborde she had shot her husband, Crystal also made a 911 call reporting shots being fired, as if someone other

11

than she had fired them. She also told the 911 operator she had not been outside. The Lewises' testimony was not clear about which day Defendant had been at John's home, and did not clearly place him in Hineston at the time of the shooting. Thus, the jury could have reasonably found Crystal did not fire the shots and that Defendant did.

Defendant on appeal also alleges the State failed to prove that, if he was present at the shooting, he was not acting in self-defense. The only "weapon" found at the scene was a "silver metal folding knife that [Detective Oakes] found nineteen feet from the front porch in front of the residence at Dovie Laird Road." The knife was not tested for fingerprints. Daniel Johnson testified he did not bring a weapon to the door of Defendant's home. No further evidence or testimony was admitted concerning the knife or any other weapon. Defendant's argument is without merit.

**ASSIGNMENT OF ERROR (by Counsel)**

Defendant alleges the trial court erred in refusing to allow him to waive his right to counsel and represent himself in his case. Defendant has a right to counsel, and to have counsel appointed if he cannot afford one, through the federal and state constitutions. U.S. Const.Amend. VI, La.Const. art. 1, § 13. However, his choice "must be knowingly and intelligently made and the assertion of the right to self-representation must be clear and unequivocal." *State v. Francis*, 07-373, p. 3 (La.App. 3 Cir. 10/3/07), 966 So.2d 1096, 1099.

The *Francis* court, citing other cases from this circuit, the Louisiana Supreme Court, and the United States Supreme Court, discussed the standard for determining whether a defendant has validly waived his right to counsel:

> Before a defendant may waive his right to counsel, the trial court must determine whether the defendant's

waiver of counsel is intelligently and voluntarily made, and whether his assertion of his right to represent himself is clear and unequivocal. *State v. Hegwood*, 345 So.2d 1179 (La.1977). The determination of whether there has been an intelligent waiver of the right to counsel depends upon the facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. *State v. Harper*, 381 So.2d 468 (La.1980). Although a defendant should be made aware of the dangers and disadvantages of self-representation, there is no particular formula which must be followed by the trial court in determining whether a defendant has validly waived his right to counsel. *State v. Carpenter*, 390 So.2d 1296 (La.1980). However, the record must establish that the accused knew what he was doing and that his choice was made "with eyes open." *Id.* at 1298, citing *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

The Third Circuit Court of Appeal has repeatedly required the trial court meet the following requirements in determining whether a defendant has validly waived his right to counsel: first, determine a defendant's literacy, competency, understanding and volition, i.e. was defendant's waiver of counsel made voluntarily and intelligently; and second, warn the defendant of the dangers and disadvantages of self-representation, so that the record establishes that the defendant knew what he was doing. [*State v.] Mitchell*, 580 So.2d 1006 [ (La.App. 3 Cir.1991), *writ denied*, 613 So.2d 969 (La.1993) ]; [*State v.] Smith*, 479 So.2d 1062 [ (La.App. 3 Cir.1985) ]; *State v. Adams*, 526 So.2d 867 (La.App. 3 Cir.1988); *State v. Sepulvado*, 549 So.2d 928 (La.App. 3 Cir.1989); and *State v. Bourgeois*, 541 So.2d 926 (La.App. 3 Cir.1989), *writ denied*, 572 So.2d 85 (La.1991).

*State v. Hayes*, 95-1170, pp. 4-5 (La.App. 3 Cir. 3/6/96), 670 So.2d 683, 685-86. *See also State v. Johnson*, 06-937 (La.App. 3 Cir. 12/6/06), 944 So.2d 864, and *State v. Whatley*, 03-655 (La.App. 3 Cir. 11/5/03), 858 So.2d 751.

*Id.*

At Defendant's first appearance before the trial court, he said he was indigent and asked the court to appoint a lawyer to represent him. Defendant made numerous pro se filings (apparently including a motion for self-representation), criticized the

13

performance of his attorneys and "fired" his first attorney, but never specifically objected to having court-appointed counsel.

Indeed, Defendant's "Motion to Reconsideration the Denial of Previous Motions" requested "that he be allowed someone to fill-in because he is (not) able to read nor write." Defendant's pro se "Motion to Appear as Co-Counsel Pro Se" acknowledged he was represented by the Indigent Defender Board and asked the court "to grant him permission to appear pro se as co-counsel with the Indigent Defenders Office."

Defendant did not make a clear and unequivocal waiver of his right to counsel at the hearing of his motion for self-representation. He told the trial court that he needed someone to represent him because he could not read or write. Likewise, at the hearing of Mr. Demourelle's Motion to Withdraw, Defendant was not clear and unequivocal when discussing the issue of self-representation. When the trial court appointed Mr. Guidry, this exchange occurred:

> [Defendant]: I don't need an attorney, Your Honor. I will represent myself in this case.
>
> The Court: No, I have already ruled that you can't represent yourself.
>
> [Defendant]: Okay. Well, I want to represent myself. I want an attorney to help me. I don't need somebody that don't want to help me. I have got a serious charge . . . and I would like to represent myself because I can't find an attorney—you ain't appointed me an attorney yet that would help me in my matter. So, ma'am, I would just be better by myself. I would be better by myself. I want to go to trial as soon as possible and represent myself. I have that right.
>
> . . . .
>
> The Court: I have already ruled that you cannot represent yourself. So, I am appointing Mr. Guidry to represent you in this matter. And this is Mr. Guidry.

14

[Defendant]: Okay. If he represents me fully, yes, ma'am. But, if he don't I'm gonna go to trial with myself cause I— . . . .

This situation is similar to that in *State v. Hypolite*, 04-1658 (La.App. 3 Cir. 6/1/05), 903 So.2d 1275, *writ denied*, 06-618 (La. 9/22/06), 937 So.2d 381. This court noted the defendant's attempt to obtain new counsel was not an unequivocal request to represent himself; it was merely a request for substitute counsel because the defendant was unhappy with his court-appointed attorney.

Here, Defendant's testimony, filings, and actions indicate he in fact wants court-appointed counsel, but wants to be able to discharge his counsel and obtain new representation when his attorney, in his estimation, is not properly defending him. Defendant is not entitled to counsel of his choice; rather, he "only has the right under the federal constitution to effective representation." *State v. Reeves*, 06-2419, p. 37 (La. 5/5/09), 11 So.3d 1031, 1056, *cert. denied*, __ U.S. __, __ S.Ct. __ (2009). Defendant has set forth no grounds to show ineffective representation, and he will have the opportunity to seek post-conviction relief on the ground of ineffective representation if he so chooses. La.Code Crim.P. art. 930.3. Accordingly, we find the trial court did not err in refusing to allow Defendant to waive his right to counsel and represent himself at trial.

## PRO SE ASSIGNMENT OF ERROR NUMBER TWO

Defendant argues the trial court erroneously denied his motion to recuse the trial judge.[2] He claims she once represented him in a prior proceeding before she became a district judge. He allegedly told her she was very beautiful and made "an explicit sexual gesture" toward her. The trial judge supposedly told her husband

---

[2]Although the record does not contain Defendant's motion to recuse, the trial judge's Order of July 27, 2007 references "the pro se motion sent to this court on July 25, 2007, for recusal of [the trial judge]; for consideration of previously filed pro se motions; and for self-representation."

15

about the incident, and he confronted Defendant's brother.  Defendant offers no support of this allegation.  He alleges the trial judge's prejudice against him (because of the alleged incident) led to her allowing Daniel to testify he was not served with the restraining order prior to the shooting, when she had presided over the hearing and issued the restraining order.

The trial judge did not have a hearing on the motion, but filed an order stating:

> **IT IS FURTHER ORDERED** that the motion to recuse [the trial judge] on the grounds that the defendant made "sexual passes" at her while she was his appointed counsel is hereby denied in that a check of the records of the 33rd Judicial Court shows that [the trial judge] has never been appointed to represent the defendant. . . .

While Defendant offered no support for his allegations, the trial judge performed a records check and offered the lack of her appointment as Defendant's prior counsel in support of her order.  Thus, the trial judge properly denied the motion to recuse and this assignment of error is without merit.

## DECREE

Defendant's convictions are affirmed.

**AFFIRMED**.

16