# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

**23-259**

**STATE OF LOUISIANA**

**VERSUS**

**DEMETRIC CORNELL SAVOY**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF ACADIA, NO. 88862
HONORABLE DAVID MICHAEL SMITH, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**D. KENT SAVOIE**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of D. Kent Savoie, Van H. Kyzar, and Ledricka J. Thierry, Judges.

**CONVICTION AND SENTENCE AFFIRMED.**

**Donald D. Landry**
**District Attorney**
**Fifteenth Judicial District**
**Post Office Box 3306**
**Lafayette, Louisiana 70502**
**(337) 232-5170**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Elliott C. Cassidy**
**Assistant District Attorney**
**Fifteenth Judicial District**
**Post Office Box 288**
**Crowley, Louisiana 70526**
**(337) 788-8831**
**COUNSEL FOR APPELLEE:**
      **State of Louisiana**

**Edward K. Bauman**
**Louisiana Appellate Project**
**Post Office Box 1641**
**Lake Charles, Louisiana 70602-1641**
**(337) 491-0570**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Demetric Cornell Savoy**

**SAVOIE, Judge.**

On July 17, 2018, Defendant, Demetric Cornell Savoy, was charged by Bill of Indictment with the second degree murder of Heather Mouton, in violation of La.R.S. 14:30.1; unauthorized entry into an inhabited dwelling, in violation of La.R.S. 14:62.3; and misdemeanor violation of a protective order, in violation of La.R.S. 14:79(B)(1). On February 17, 2022, an Amended Indictment was filed that removed the misdemeanor charge, maintaining the charges of second degree murder and unauthorized entry into an inhabited dwelling.

Trial commenced on June 21, 2022, and on June 23, 2022, Defendant was found guilty as charged on both second degree murder and unauthorized entry into an inhabited dwelling. On August 12, 2022, a sentencing hearing was held. At the start, the trial court heard two defense-filed motions, a "Motion for New Trial," and a "Motion for Post-Judgment Verdict of Acquittal." The trial court denied both motions and proceeded to sentence Defendant to the mandatory sentence of life imprisonment without benefits for second degree murder as well as the maximum sentence of six years at hard labor for unauthorized entry of an inhabited dwelling. The sentences were ordered to run concurrently to each other.

Defendant now appeals his conviction for second degree murder, raising four assignments of error: (1) there was insufficient evidence to convict Defendant of the second degree murder of Heather Mouton; (2) even if the court finds the State proved Defendant killed Ms. Mouton, a conviction for manslaughter should be entered; (3) the trial court committed reversible error when it allowed Ms. Mouton's statements, made as part of an application for protective order, to be introduced at trial; and (4) the trial court erred in denying Defendant's motion to

quash regarding the surveillance video obtained from a neighbor. For the foregoing reasons, Defendant's conviction and sentence are affirmed.

## FACTS

Defendant was convicted of the murder of Heather Mouton.

At trial, the State's first witness was Mr. Russell Faulk, who testified that he retired after thirty-two years with the Acadia Parish Sheriff's Office. According to Mr. Faulk, he spent his last ten years as a sergeant in the Civil Division of the Sheriff's Office, serving court orders and legal documents. Mr. Faulk testified that on May 24, 2018, he served Defendant with a restraining order at 7:00 a.m.; the restraining order had been filed on May 11, 2018, and was set for hearing at the end of the month. On cross-examination, Mr. Faulk acknowledged that when he filled out the return showing he served Defendant with the restraining order, he did not have Defendant sign the return. He later clarified that his standard practice was to fill out the return information himself and that it was never signed by the person being served.

During Mr. Faulk's testimony, State's Exhibits 1 and 2 were introduced. State's Exhibit 1 (in globo) was a packet including Ms. Mouton's May 11, 2018 "Petition for Protection from Abuse." The petition described two instances of recent violence between Defendant and Ms. Mouton, one on May 1, 2018, and the other on May 10, 2018. According to the petition, on May 1, 2018, they were leaving an event when Defendant asked to use a phone charger, and Ms. Mouton gave him attitude about it; while she was driving, Defendant punched her in the jaw. Upon arriving home, Defendant choked Ms. Mouton and eventually demanded that she bring him to his truck; however, she was able to lock him out of the car and leave.

On May 10, 2018, Defendant followed Ms. Mouton to work, apologized, and asked her to reconcile. The conversation turned ugly with Defendant asking Ms. Mouton "if [she] was ready to die & [she] said are you ready to kill me? Lord knows I'm not ready to die I have to[o] much to live for. [Defendant] said [she] better not report him or else & [she] went in to work." She then called law enforcement, and they took her statement.

The State's next witness was Ms. Mary Richard, the 911 Director for the Acadia Parish Communications District. Ms. Richard was called for the sole purpose of introducing State's Exhibit 3, a 911 recording entered into evidence "for the limited purposes of establishing why the police were called and why an investigation was being opened."

The State then called Lieutenant Nicholas Penn, the evidence officer and IT technician for the Crowley Police Department. Lieutenant Penn testified that he was working patrol on the night Ms. Mouton died and became involved in the investigation when he was dispatched in reference to the 911 call. Lieutenant Penn stated that he was the first officer on the scene and found Ms. Mouton in the den, "face down with a pool of blood near her head." After the investigating detectives arrived, Lieutenant Penn spoke with Ms. Mouton's family and directed other officers to search for evidence. Lieutenant Penn testified they recovered two .22 shell casings at the murder scene.

On cross-examination, Lieutenant Penn was questioned about certain digital evidence given his dual role as evidence custodian and "IT guy" for the Crowley Police Department. Lieutenant Penn testified that although he was aware that Detectives Comeaux and Gibson interviewed the victim's juvenile daughter, Haleigh Patton, he had been unable to find said interview, either in the Axon cloud

storage they used for maintaining body camera footage or on a physical disc in the department's case file.

The State then called Officer Robyn Osborne, a patrol officer with the Crowley Police Department. According to Officer Osborne, there were already multiple vehicles at Ms. Mouton's 1267 Lurose Drive address when she arrived. Officer Osborne testified she helped escort family members, including some children, out of the residence. Officer Osborne stated that she was unable to locate the wound in Ms. Mouton's head due to Ms. Mouton having a sewn-in hairpiece. She also stated they located a chicken bone that Ms. Mouton appeared to have been eating.

Officer Osborne testified that while canvassing the area, a neighbor informed her that Ms. Isalee Malbrough had security cameras that were aimed towards 1267 Lurose and might be able to help. According to Officer Osborne, Ms. Malbrough did not know how to pull up past video; however, Officer Osborne was able to bring up Ms. Malbrough's surveillance footage from about 9:00 p.m. until law enforcement arrived after the shooting. Officer Osborne identified pictures of the two .22 caliber shell casings that were found in the same room as Ms. Mouton.

Officer Osborne testified that when she went to Ms. Malbrough's home, she was able to help Ms. Malbrough bring up the surveillance footage which showed the front of 1267 Lurose. Officer Osborne identified State's Exhibit 18 as a flash drive containing a portion of the surveillance video Officer Osborne viewed at Ms. Malbrough's residence on the night of the shooting.

On cross-examination, Officer Osborne acknowledged that Ms. Malbrough was having difficulties pulling up the video. Although Officer Osborne testified

4

she helped Ms. Malbrough access the footage, she subsequently acknowledged that she did not actually know how the system worked either. Officer Osborne testified she watched portions of the surveillance footage from roughly 9:00 p.m. until right around midnight, when the shooting occurred. Officer Osborne confirmed that after watching the video, she relayed to Detectives Gibson and Comeaux, as well as Chief Broussard, that Ms. Malbrough was willing to cooperate, and they just needed to go to her to get the footage. She also confirmed the video showed a number of people going in and out of the 1267 Lurose residence.

After reviewing her body camera footage, Officer Osborne acknowledged telling her superiors that she saw two black males entering the house at 9:09 p.m. She also recalled seeing a vehicle leave the house and return later. She stated she observed the vehicle drop off a black male in a white t-shirt, the black male leave, then later a truck drop off the same black male at the house. Officer Osborne testified that she was not the individual who recovered footage from Ms. Malbrough. According to Officer Osborne, she took a DNA swab of the door on the north side of the home because that was the door people used in the surveillance footage.

The State's next witness was Ms. Malbrough, who testified she had lived across the street from the victim for almost twenty years; she gave her address as 1266 Lurose Drive. On the night Ms. Mouton died, Ms. Malbrough testified she was sleeping, got up to use the restroom, and heard a commotion outside; law enforcement came to her door shortly thereafter. Ms. Malbrough testified that she watched the footage from her surveillance system with law enforcement that night. Furthermore, Ms. Malbrough testified that State's Exhibit 18 was a five-minute

section of the footage she reviewed with Officer Osborne on the night of the shooting.

State's Exhibit 18 was then played for the jury over defense counsel's objection. The video begins with two people, presumably Mr. and Mrs. Montgomery, exiting the 1267 Lurose residence and leaving in a truck parked in front of the home. Shortly thereafter, a black male wearing dark pants and a white shirt enters the video from the right side, walks up the driveway and into the 1267 Lurose residence. Roughly seventy seconds later, the same black male in a white shirt runs out the side entrance to the house, the same door he used to enter, then runs across the front yard of 1267 Lurose heading towards the left side of the video.

On cross-examination, Ms. Malbrough said she had no idea anything was going on across the street until law enforcement knocked on her door. Ms. Malbrough indicated that although she had an application on her phone that allowed her to review her surveillance footage, she initially had some difficulty viewing the surveillance footage on her laptop. According to Ms. Malbrough, her camera records all day, and the video shown was only a portion of the footage she reviewed with Officer Osborne on the night of the shooting. Ms. Malbrough testified law enforcement came back to download footage within a few days of the shooting, but she could not give a more specific timeline.

According to Ms. Malbrough, she was contacted by law enforcement at work and subsequently went to the police department, signed into her surveillance account, and allowed them to download the footage they desired. She did not know, however, how much footage they actually downloaded.

The State then called Ms. Cassandra Mouton, the victim's aunt. Ms. Cassandra testified that on May 24, 2018, she was at 1267 Lurose at the home of her sister Mrs. Jackie Montgomery. According to Ms. Cassandra, Mrs. Montgomery was cooking while Ms. Mouton was playing music through her phone. Ms. Cassandra testified a number of people were at 1267 Lurose: Ms. Mouton, Mrs. Montgomery, Mr. James Montgomery, and Ms. Mouton's friend Ashley, whom they all called "Hallee Berry." Ms. Cassandra also testified that her daughter Kennedy was present, along with Ms. Mouton's daughter Haleigh, and Ms. Mouton's sons Demetric Savoy, Jr., ("DJ"), and Halen Mouton. According to Ms. Cassandra, they were all at 1267 Lurose for a few hours; however, Ms. Cassandra testified she believed she left around 10:30 p.m. as she had to work the following morning.

Ms. Cassandra testified that she returned to her sister's home after midnight because she was informed that Ms. Mouton was hurt. According to Ms. Cassandra, when she got to the house, Mrs. Montgomery was "out of it," walking around in circles stating, "he killed my baby." Ms. Cassandra testified they called 911, for the second time, and the operator told her to turn Ms. Mouton on her back; after taking a chicken bone out of Ms. Mouton's mouth, Ms. Cassandra was turning her over when law enforcement arrived and had the family exit the house. According to Ms. Cassandra, Ms. Mouton's body was in the den between the sofa and the television. Ms. Cassandra testified Ms. Mouton and her children were living with Mrs. Montgomery because Ms. Mouton was afraid of Defendant and "was scared she was going to get hurt."

The State's next witness was Mrs. Jacqueline ("Jackie") Mouton Montgomery, the victim's mother. Mrs. Montgomery testified she still lived at

7

1267 Lurose along with her husband James and her three grandchildren, Halen Mouton, Haleigh Patton, and DJ. According to Mrs. Montgomery, on the night of May 24, 2018, they had a small get together at her house, and Mrs. Montgomery cooked fried chicken. Mrs. Montgomery testified that Defendant was not at the house and was not allowed at the house because she did not want him there and because Ms. Mouton had a restraining order against him.

Mrs. Montgomery testified that a little before midnight, she left the house to get cigarettes from the drive-through convenience store near her house; she returned about ten to fifteen minutes later. At that point, her granddaughter was at the door screaming, and Mrs. Montgomery entered her house to find Ms. Mouton on the floor of the den, dead.

The State's next witness was the victim's daughter, Haleigh Patton, who was fifteen when she testified. According to Ms. Patton, on the night her mother was killed, she was in her room in bed on her phone when Defendant came into the room, pulled her covers off, and asked where Ms. Mouton was. Ms. Patton testified Defendant had been her stepfather, that she saw him every day while her mother was married to him, and that she was positive it was Defendant who came into her room. She described his attire that night as "[a] white shirt, like, some dark colored jeans, and some boots." After telling Defendant she did not know where her mother was, Ms. Patton testified he left the room. According to Ms. Patton, Defendant was in her room for no more than twenty or thirty seconds. Ms. Patton testified she waited a couple of minutes after Defendant left her room to get up and go to the bathroom, at which time she saw her mother on the floor. She then locked herself in the bathroom and texted her aunt. She clarified she texted

8

her Aunt Cassandra and told her Defendant was in the house and her mother was on the floor.

Ms. Patton testified she was in the bathroom between three and five minutes before she went to the kitchen to call another aunt, at which time she heard Mrs. Montgomery return. Ms. Patton testified that she heard her mother fall while she was in her room. According to Ms. Patton, when her grandmother turned on the lights, she saw her mother "on the floor with blood coming out of her head."

On cross-examination, Ms. Patton testified that Ms. Mouton used her phone frequently to communicate with her children and her friends, including her friend Hallee, with whom Ms. Mouton had been hanging out the night she died. Ms. Patton testified Hallee was the only friend Ms. Mouton had been with that night. Ms. Patton did not recall telling law enforcement the night of the shooting that she did not hear anything after Defendant left her room or that she was sleeping when Defendant came into her room. Ms. Patton testified she did not see a gun when Defendant came into her room.

The State then called Dr. Terry Welke, the Calcasieu Parish Coroner, who was accepted as an expert in forensic pathology. Dr. Welke testified that he performed an autopsy on Heather Mouton at 1:45 p.m. on May 25, 2018. He found two gunshot wounds on the right side of Ms. Mouton's head, noting "[o]ne was above the ear, and one was slightly above and in front of the right ear." Dr. Welke stated there were no exit wounds, and he removed two projectiles from Ms. Mouton's head during the autopsy. Although Dr. Welke made it clear he was not a firearms expert, he identified the bullets removed from Ms. Mouton's head as being fired from a "small caliber" weapon consistent with a .22 caliber pistol or a

9

similar caliber. Dr. Welke testified that Ms. Mouton's cause of death was two gunshot wounds to the head and described the death as a homicide.

On cross-examination, Dr. Welke noted that among Ms. Mouton's tattoos was a heart with the name "Jeremy" written inside of it, located on her "left upper frontal chest." The State then recalled Officer Penn to confirm that the shell casings recovered from the crime scene were .22 shells. The State then rested its case-in-chief.

The first witness called by defense counsel was Deputy Kade Patin, a ten-year veteran of the Acadia Parish Sheriff's Office. Deputy Patin testified that in the early hours of May 25, 2018, he and Deputy Randy Chaisson, of the Acadia Parish Sheriff's Office, arrested Defendant in west Crowley. At some point after the arrest, Officer David Taylor, of the Crowley Police Department, arrived as well. Deputy Patin testified that he believed they arrived around 1:30 a.m.

According to Deputy Patin, they found Defendant behind a fence and took him into custody without incident. After reviewing his body camera footage, Deputy Patin acknowledged Defendant was arrested wearing a plaid shirt and blue-jeaned shorts. The arrest occurred near Defendant's residence roughly an hour after Ms. Mouton's death.

Defense counsel then called Captain Michael Luke Fontenot, a Criminal Investigations Division supervisor with the Evangeline Parish Sheriff's Office and former detective with the Crowley Police Department. Captain Fontenot testified that he helped prepare the applications for search warrants in this case even though Detective Steve Comeaux was the lead detective. According to Captain Fontenot, he participated in the execution of search warrants for 618 Spann Avenue and 1106 West Sixth Street, addresses associated with Defendant. Captain Fontenot testified

10

they were looking for firearms, clothing, and DNA evidence. Captain Fontenot did not believe law enforcement recovered any evidence from either location. Captain Fontenot stated that he prepared an additional search warrant for the victim's cellphone; after the search warrant was granted, the phone was brought to the Lafayette Parish Sheriff's Office for a forensic search.

Captain Fontenot testified that in April 2021, while he was still with the Crowley Police Department, he was tasked with locating an interview between Haleigh Patton and Detective Comeaux; however, the video could not be found. Captain Fontenot testified he found no evidence the interview was intentionally deleted; he simply found nothing related to the instant case.

The defense then recalled Lieutenant Nicholas Penn. Lieutenant Penn testified the only footage he knew was recovered from Ms. Malbrough's surveillance camera was the five-minute clip previously played for the jury; Lieutenant Penn was unaware of who recovered that footage from Ms. Malbrough for the Crowley Police Department. Lieutenant Penn testified that when he spoke with Ms. Patton, she told him she did not hear anything out of the ordinary after speaking to Defendant the night of the murder.

Defense counsel then called Chief Jimmy Broussard of the Crowley Police Department. Chief Broussard testified the case against Defendant was led by Detective Steve Comeaux with assistance from Detective Chad Gibson. Chief Broussard testified that in his sixteen years in law enforcement, he had never utilized a gunshot residue test nor seen an officer use such a kit. He testified gunshot residue tests were difficult and costly, so the prior chief had instructed officers not to use them. Based on body camera footage, Chief Broussard acknowledged that Officer Taylor requested permission to do a gunshot residue

11

test but noted that "[s]omeone said no." Chief Broussard testified that he was unaware who was assigned the case once Detective Comeaux left the department.

Defense counsel then called Lieutenant Blake Soileau, the Human Resources Director for the Lafayette Parish Sheriff's Office. Lieutenant Soileau testified that he had roughly fourteen years of total experience in law enforcement, including time working in the Lafayette Parish Sheriff's Office in the intelligence department, specifically focused on digital forensics. Lieutenant Soileau testified that he spent months doing on-the-job training in digital forensics with members of the Attorney General's Office. According to Lieutenant Soileau, he analyzed roughly two hundred to three hundred cellphones while doing digital forensics for the Lafayette Parish Sheriff's Office. Lieutenant Soileau was subsequently accepted as an expert in the field of "phone forensic analysis."

According to Lieutenant Soileau, the sheriff's office primarily used a software called Cellebrite, which allowed them to connect a phone to a computer via USB cable so the software could download a copy of the information on the phone. Lieutenant Soileau noted the program copied incoming and outgoing phone calls, text messages, photographs, etc. Lieutenant Soileau testified the phone extraction was done on June 1, 2018.

Defense counsel then called Ms. Choi Nguyen, a forensic DNA analyst for the Acadiana Criminalistics Laboratory. Ms. Nguyen was accepted by the court as an expert witness in the field of forensic DNA analysis. In the instant case, Ms. Nguyen noted she tested a swab from the side door of the victim's home and the two recovered cartridge casings. According to Ms. Nguyen, there were no recoverable DNA profiles on the cartridges, although the door swab contained a partial DNA profile. Ms. Nguyen testified she was provided with two DNA

12

reference samples, one for Haleigh Patton and one for Defendant; both individuals were excluded as potential contributors to the partial DNA profile located on the swab taken from the side door.

On cross-examination, Ms. Nguyen clarified the lack of DNA on the cartridge cases was common because the heat of the gunshot often burns off any DNA. Ms. Nguyen noted UV light, bleach, and ethanol could all destroy DNA as well.

The trial court then read into the record the following stipulation reached by the State and defense counsel: "Former Detective Steve Comeaux testified at a previous hearing that Haleigh Patton was woken up by Demetric Savoy pulling her covers back." At that point, the defense rested its case, and the parties proceeded to closing arguments.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## LAW AND DISCUSSION

### I.    *Assignment of Error Number One*

In his first assignment of error, Defendant contends the State presented insufficient evidence to convict him of the second degree murder of his estranged wife, Heather Mouton. Defendant specifically challenges the credibility of Haleigh Patton, the victim's then eleven-year-old daughter, who placed Defendant in the house looking for Ms. Mouton immediately before Ms. Mouton was shot twice in the head. The analysis for insufficient-evidence claims is well settled:

13

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981).  It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review.  *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

In the instant case, Defendant was charged with second degree murder, in violation of La.R.S. 14:30.1(A)(1), which relevantly defines second degree murder as the killing of a human being "[w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]"

Defendant contends the evidence against him is insufficient because there were numerous people at the residence the night Ms. Mouton was murdered; he was excluded as the source of the partial DNA profile found on the side door; Ms. Patton testified she did not see him armed with any kind of weapon; and Ms. Patton's testimony about whether she was asleep when Defendant entered her room and whether she heard anything afterwards was different at trial than it was the night of the shooting.  For the following reasons, we disagree that the evidence was insufficient.

This case is based almost entirely on circumstantial evidence:

"Generally, direct evidence consists of testimony from a witness who actually saw or heard an occurrence, proof of the existence of which is at issue[.]" *State v. Lilly*, 468 So.2d 1154, 1158 (La.1985).

14

Circumstantial evidence, however, "consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience." *Id.*

In *State v. Major*, 03–03522, p. 6 (La. 12/1/04), 888 So.2d 798, 801–02, the supreme court explained that:

> when the conviction is based on circumstantial evidence, La. R.S. 15:438 sets forth the rule that "assuming every fact to be proved that the evidence tends to prove, in order to convict, [the circumstantial evidence] must exclude every reasonable hypothesis of innocence." However, La. R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; rather it serves as a helpful evidentiary guide for jurors when evaluating circumstantial evidence. *State v. Toups*, 01–1875, p. 3 (La.10/15/02), 833 So.2d 910, 912; *State v. Chism*, 436 So.2d 464, 470 (La.1983). When evaluating circumstantial evidence, the trier of fact must consider
>
>> the circumstantial evidence in light of the direct evidence, and vice versa, [and] the trier of fact must decide what reasonable inferences may be drawn from the circumstantial evidence, the manner in which competing inferences should be resolved, reconciled or compromised; and the weight and effect to be given to each permissible inference. From facts found from direct evidence and inferred from circumstantial evidence, the trier of fact should proceed, keeping in mind the relative strength and weakness of each inference and finding, to decide the ultimate question of whether this body of preliminary facts excludes every reasonable hypothesis of innocence.
>
> *Chism*, 436 So.2d at 469.

*State v. Richardson*, 16-107, pp. 5–6 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 346–47 (alterations in original).

In the instant case, as noted by Defendant in his brief, Ms. Patton's testimony was the only evidence that definitively placed him inside the house at

the time of Ms. Mouton's death. No one could identify Defendant as the individual who entered the residence shortly before Ms. Mouton's death and fled the scene immediately thereafter, there was no physical evidence that could place Defendant in the residence, no murder weapon was found, and law enforcement never recovered any clothing that matched what the individual on the security footage was wearing. Despite this, we find the State's evidence is sufficient to support Defendant's conviction. While Defendant correctly notes Ms. Patton's testimony that she was awake when Defendant came in her room differed from what she told Detective Comeaux the night of the murder, it does not affect her identification of Defendant. While Ms. Patton may have only been eleven years old when her mother was murdered, she was very familiar with Defendant. Defendant had been Ms. Patton's stepfather, they had lived together while Defendant was married to Ms. Mouton, and he was the father of Ms. Patton's younger brother. Ms. Patton testified she was positive Defendant was the person who entered her room.

Ms. Patton's testimony established Defendant was inside the residence shortly before Ms. Mouton was murdered; furthermore, there was no evidence that he was still in the home when Mrs. Montgomery returned from the convenience store shortly thereafter. As such, the jury, when viewing the evidence in the light most favorable to the prosecution, could have found the State excluded every reasonable hypothesis of innocence, thereby proving that Defendant had to be the individual who shot Ms. Mouton in the head twice then fled the home.

While Defendant makes much of the fact that law enforcement never found clothing that matched what the individual in the surveillance footage was wearing, the fact remains Defendant was not arrested until an hour later, at his residence.

16

The jury could have easily assumed Defendant changed and disposed of his clothing in the hour between Ms. Mouton's death and Defendant's arrest. Finally, Defendant has failed to put forward any reasonable hypothesis of innocence in his brief, aside from a comment that "many individuals entered and exited the home of Mrs. Montgomery that evening, any one of whom could have shot Ms. Mouton." The jury was shown evidence that Defendant had threatened to kill Ms. Mouton if she reported him to law enforcement, he learned on the day of the shooting that she had done just that, and Ms. Patton testified Defendant was in the home at the exact time her mother was murdered. As such, the State disproved the idea that one of the people who had been at the house earlier in the evening killed Ms. Mouton. Ms. Patton testified as to what Defendant was wearing when he entered the home. Video shows a person, who was wearing that same clothing, enter the house after Mrs. Montgomery left and then flee the home less than two minutes later. As such, a rational juror could have reasonably found the State refuted any reasonable hypothesis of innocence.

## II. *Assignment of Error Number Two*

In his second assignment of error, Defendant contends that even if this court finds he killed Ms. Mouton, it should find him guilty of the lesser, included offense of manslaughter. The following seems to be Defendant's basis for this claim:

> This volatile relationship seems to reveal that Mr. Savoy was still enamored with Ms. Mouton. They had a young son together who was now four years old. Mr. Savoy could not let go. It is quite possible he learned Ms. Mouton was dating other people, as Crowley is not a big city. In addition, H[aleigh ]P[atton] testified that on the night her mother was murdered, her mother was out with a "friend."

Manslaughter is appropriately defined by La.R.S. 14:31(A)(1) as:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the

17

offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

However, this court has previously stated that "an argument alone is not sufficient provocation to support a verdict of manslaughter." *State v. Johnson*, 06-623, p. 11 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, 704, *writ denied*, 06-3024 (La. 9/14/07), 963 So.2d 995. As noted by this court in *Johnson*, "In reviewing the Defendant's claim, this court must determine 'if a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence.'" *Id* at 702 (quoting *State v. Hamilton*, 99-523, p. 7 (La.App. 3 Cir. 11/3/99), 747 So.2d 164, 168). In the present case, it was impossible for a rational trier of fact to find Defendant established mitigating factors by a preponderance of the evidence. At trial, defense counsel questioned multiple witnesses about two men the victim may have been in a relationship with; however, no evidence was introduced to indicate the victim was in a relationship with either of those men at the time of her death. Ms. Cassandra Mouton testified that while she knew Terry Wilson, she did not know Ms. Mouton was in a relationship with him. She also recognized the name Jeremy Young, put to her by defense counsel, but stated that he was Ms. Mouton's "high school sweetheart." Additionally, Mrs. Montgomery testified that Jeremy Young and Ms. Mouton had not been in a relationship since high school, although she stated Ms. Mouton and Mr. Wilson had been in a relationship in the year before Ms. Mouton died.

18

While Defendant references Ms. Patton's testimony that her mother may have been with "a friend," it was clear from Ms. Patton's testimony that the friend was a female acquaintance with whom Ms. Mouton was close friends. There was no evidence presented to support the suggestion that Defendant killed Ms. Mouton in "sudden passion" or in "heat of blood," particularly given their previous argument was two weeks before Ms. Mouton was murdered.

We find Defendant's assignment of error lacks merit. Defendant failed to prove the existence of any "sudden passion" or "heat of blood" mitigating factors. This is highlighted by Defendant's inability to state what circumstance actually caused such a reaction. Instead, he argued to this court that due to the volatile nature of their relationship, "[i]t is quite possible he learned" Ms. Mouton was in another relationship and suggested Ms. Mouton was on a date with another man based on Ms. Patton's testimony. In short, Defendant presented no evidence to support the claim that mitigating factors existed.

### III. *Assignment of Error Number Three*

Having challenged the sufficiency of the State's evidence in his first two assignments of error, Defendant contests the admissibility of certain evidence in his third assignment of error. Specifically, Defendant contends "**[t]he trial court erred in denying Defendant's Motion in Limine regarding statements Ms. Mouton made while seeking protective orders, accusing Mr. Savoy of domestic violence.**" Defendant argues the statements made by Ms. Mouton in her applications for protective orders "were testimonial, as well as hearsay, and had to be excluded under *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354 (2004)." Furthermore, he contends the State's argument that the information is admissible under the forfeiture by wrongdoing provision of La.Code Evid. art. 804(B)(7). In

19

*Crawford*, 541 U.S. at 68 (footnote omitted), the Supreme Court was clear that the protections of the Sixth Amendment apply to prior testimonial statements:

> Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law—as does [*Ohio v.*] *Roberts*, [448 U.S. 56, 100 S.Ct. 2531 (1980),] and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of "testimonial." Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed.

The forfeiture by wrongdoing exception to the general prohibition against hearsay is set forth in La.Code Evid. art. 804(B)(7):

> **(a) Forfeiture by wrongdoing.** A statement offered against a party that has engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness.

> (b) A party seeking to introduce statements under the forfeiture by wrongdoing hearsay exception shall establish, by a preponderance of the evidence, that the party against whom the statement is offered, engaged or acquiesced in the wrongdoing.

In *Giles v. California*, 554 U.S. 353, 128 S.Ct. 2678 (2008), the Supreme Court ruled the forfeiture by wrongdoing exception required a showing that the defendant had acted to prevent the victim from testifying. Specifically, the Court stated:

> The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying-declarations exception. Prosecutors do not appear to have even *argued* that the judge could admit the

unconfronted statements because the defendant committed the murder for which he was on trial.

*Id*. at 361–62.

At the hearing on the its motion, the State acknowledged its burden of proving by a preponderance of the evidence that Defendant killed Ms. Mouton to make her unavailable as a witness. The State then argued that in the information provided by the victim on May 11, 2018, she stated that on May 10, 2018, Defendant asked her if she was ready to die and told her she better not report him or else. The State also argued:

> I think the only reasonable interpretation of that is that he was gonna [sic] kill her, because he punched her in the jaw on May 1st, he threatened her on May 10th, he was served on May 24th, and he killed her on May 25th. And the Forfeiture by Wrongdoing Statute says it's not hearsay - - it's an Exception to the Hearsay Rule if you are the reason that she is not on the stand and you intended it to be that way. And that's exactly what we have here.

Ultimately, the trial court ruled the petition was admissible under the forfeiture by wrongdoing exception. An important aspect of the State's argument was its invocation of *State v. Moran*, 16-868 (La.App. 3 Cir. 5/3/17), 218 So.3d 749, *writ denied*, 17-1000 (La. 4/16/18), 239 So.3d 831. In *Moran*, the defendant was charged with the first degree murder of his wife. The trial court held that Mrs. Moran's prior statements to law enforcement (that the defendant had choked her and then threatened to kill her if she reported him) were admissible under the forfeiture by wrongdoing exception. Despite the fact that Defendant threatened to kill Ms. Mouton if she reported him, and she turned up dead the day he was given notice that she had reported him, Defendant argued that *Moran* supported his claim that the forfeiture by wrongdoing exception was inapplicable. This court held:

> Mr. Moran's intent is established by his words and actions before and after the killing. After Mr. Moran choked his wife, he

21

threatened to kill her and himself if she reported him to the police. Ms. Moran called 911 and told the dispatcher Mr. Moran choked and threatened her. Ms. Moran also stated that Mr. Moran overheard her talking to the dispatcher, opened the door, and threatened her again. He then hid under the house as officers arrived and attempted to secure the home, waited until the officers left, kicked in the door, and fulfilled his promise to kill his wife.

Mr. Moran's arguments that he did not kill his wife with the intent to make her unavailable to testify are unconvincing. First, the language of La.Code Evid. art. 804(B)(7) does not mandate that there must be a case pending against Mr. Moran at the time of the killing to utilize the forfeiture by wrongdoing provision. Additionally, the facts of *Giles* [*v. California*], 554 U.S. at 353, 128 S.Ct. 2678 [(2008)], does not indicate there was a charge pending for the prior domestic abuse allegation or any other criminal act where the victim was expected to testify.

*Id*. at 758.

Following *Moran*, we find the statements made by Ms. Mouton in her applications for protective orders were admissible under the forfeiture by wrongdoing exception to the hearsay rule. Like *Moran*, Defendant threatened to kill Ms. Mouton if she reported him to police; like *Moran*, the victim was killed shortly after Defendant learned she had reported him to police. Although Defendant contends there were no pending criminal charges against him and the most he could have been facing was a misdemeanor, the *Moran* court dismissed that argument, and so do we.

### IV. *Assignment of Error Number Four*

In his fourth and final assignment of error, Defendant contends "**[t]he trial court erred in denying Mr. Savoy's Motion to Quash the excerpt of surveillance video (S-18) obtained from Ms. Isalee Malbrough.**" On June 4, 2021, Defendant filed a "Motion to Quash or in the Alternative Motion to Exclude Surveillance Video and Motion for Sanctions Pursuant to La. C. Cr. P. Art 729.5," in which Defendant sought to have video evidence, recovered from the

surveillance system of the victim's neighbor, Ms. Isalee Malbrough, excluded from use at trial after police failed to preserve any of the video evidence beyond a five-minute time frame between 11:56 p.m. and 12:01 a.m. on the night of Ms. Mouton's murder. Defendant contended that the video, based on information obtained from Officer Osbourne's body camera, showed multiple suspects enter and leave the victim's residence throughout the night of the murder, including during the time frame of the midnight shooting. A hearing on the motion was held on August 5, 2021, at which time the trial court denied the motion.

None of the arguments put forth by Defendant in this assignment of error are actually related to the hearing on the motion to quash; rather, they all relate to the in-trial objection raised by counsel to the admissibility of the video. At that time, the trial court ruled, "I'll admit it conditioned upon facts, on the fact that she testifies that this is accurately depicted of [sic] what she saw that night on the same video, that it is a portion of the same video, you know." Testimony established that, on the night of Ms. Mouton's murder, both Officer Osborne and Ms. Malbrough watched the surveillance footage. At trial, both Officer Osborne and Ms. Malbrough identified the video entered as State's Exhibit 18 as a portion of the video they reviewed from Ms. Malbrough's security system on the night of the murder.

Defendant also argues there was a failure to establish a chain of custody of the video given that testimony from Detective Comeaux at the hearing on the motion to quash conflicted with Ms. Malbrough's statement at trial that someone from law enforcement came to her and retrieved a copy of the video. However, as this court has previously stated, "[A]ny defect in the chain of custody goes to the

23

weight of the evidence, not its admissibility." *State v. Celestine*, 11-1403, p. 8 (La.App. 3 Cir. 5/30/12), 91 So.3d 573, 579.

Defendant argues the State failed to lay a foundation for introduction of the evidence based on La.Code Evid. art. 901(A), which states, "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Defendant also cites *State v. Rice*, 17-446, pp. 2–3 (La. 6/29/17), 222 So.3d 32, 33, which states:

> Such evidence may come in the form of testimony by a witness with knowledge that the matter is what it is asserted to be; indications of the item's distinctive characteristics, including its contents, substance, internal patterns, and other distinctive characteristics; or evidence describing the process or system used to produce the item and showing that the process or system produces an accurate result.

In *Rice*, the supreme court held the testimony of a witness that he had designed the system and setting forth the details regarding how the system worked was sufficient to render the video footage admissible. Defendant contends the lack of such detailed information in the instant case renders the video obtained from Ms. Malbrough's security footage inadmissible. We disagree.

As stated in *Rice*, the evidence sufficient to find a video admissible "may come in the form of testimony by a witness with knowledge that the matter is what it is asserted to be[.]" *Id.* There is no evidence to suggest the video is not footage from the night of the murder, showing the front of Ms. Mouton's residence. In short, Defendant did not argue that the video was not what it purported to be, but rather he argued that it was not complete.

We find that the evidence presented at trial, namely the testimony of two witnesses who viewed the footage the night of the murder confirming the video

24

was from that night, was sufficient to prove the video was what the State purported it to be: a clip of security footage from the night of the shooting. As such, this assignment of error lacks merit.

## DECREE

Defendant's conviction and sentence are affirmed.

**CONVICTION AND SENTENCE AFFIRMED.**