**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**24-379**


**STATE OF LOUISIANA**

**VERSUS**

**MARGARET YVETTE LEE BARKER**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 21-3387
HONORABLE CHARLES T. CRAVINS, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**CHARLES G. FITZGERALD**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***


Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Guy E. Bradberry, Judges.


**AFFIRMED AND REMANDED**
**WITH INSTRUCTIONS.**

**Annette Roach**
**Louisiana Appellate Project**
**Post Office Box 6547**
**Lake Charles, Louisiana 70606**
**(337) 436-2900**
**Counsel for Defendant/Appellant:**
        **Margaret Yvette Lee Barker**

**Chad Pitre**
**District Attorney**
**Kathleen E. Ryan**
**Assistant District Attorney**
**Fourteenth Judicial District**
**Post Office Box 1968**
**Opelousas, Louisiana 70571**
**(337) 948-0551**
**Counsel for Appellee:**
        **State of Louisiana**

**FITZGERALD, Judge.**

Defendant, Margaret Yvette Lee Barker, appeals her conviction and sentence for second degree murder.

In November 2021, Defendant was charged by grand-jury indictment with the second degree murder of her former husband, John Barker. In March 2024, a unanimous jury found Defendant guilty as charged. And in April 2024, the trial court sentenced Defendant to life in prison without benefit of parole, probation, or suspension of sentence.

On appeal, Defendant asserts two assignments of error:

1) The State failed to prove beyond a reasonable doubt that [Defendant's] actions were not justifiable, reasonable, and apparently necessary in order to prevent a forcible offense against her person, or alternatively, the jury erred in failing to conclude that the defense established by a preponderance of the evidence that the shooting was committed in sudden passion or heat of blood.

2) The trial court erred in overruling the defense's objection to a demonstration by Krotz Springs Chief of Police of a duty belt worn by [Defendant] at the time of the shooting, and, in later finding that although the prejudicial effect of the demonstration outweighed its probative value, an instruction to the jury to disregard both the demonstration as well as opinion testimony given by the Chief of Police was sufficient to cure any harm caused to [Defendant].

LAW AND ANALYSIS

## I.    Errors Patent

All appeals are reviewed for errors patent on the face of the record. La.Code Crim.P. art. 920. In this case, the minutes of sentencing and Uniform Commitment Order require correction. Specifically, the sentencing transcript reflects that Defendant's sentence was imposed without benefit of parole, probation, or suspension of sentence. Yet this language is not reflected in the court minutes or commitment order. As explained in *State v. Wommack*, 00-137, p. 4 (La.App. 3 Cir.

6/7/00), 770 So.2d 365, 369, *writ denied*, 00-2051 (La. 9/21/01), 797 So.2d 62, "when the minutes and the transcript conflict, the transcript prevails."

Thus, the trial court will be instructed on remand to amend both the court minutes and commitment order to reflect that Defendant's sentence was imposed without benefit of parole, probation, or suspension of sentence.

## II. Defendant's First Assignment of Error

In her first assignment of error, Defendant contests the sufficiency of the evidence to sustain her second degree murder conviction. Defendant initially argues that her actions were justified under the circumstances of the encounter. But in the alternative, she argues that a conviction for the lesser included verdict of manslaughter would have been more appropriate.

A sufficiency-of-the-evidence challenge is reviewed on appeal under the standard set forth in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. "This standard, now legislatively embodied in La.C.Cr.P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact-finder." *State v. Pigford*, 05-477, p. 6 (La. 2/22/06), 922 So.2d 517, 521.

Under this standard, the appellate court's function is not to assess the credibility of witnesses or to reweigh the evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So.2d 442. The reviewing court must instead afford great deference to a jury's decision to accept or reject the testimony. *State v. Allen*, 36,180 (La.App. 2 Cir. 9/18/02), 828 So.2d 622, *writs denied*, 02-2595 (La. 3/28/03), 840 So.2d 566, and 02-2997 (La. 6/27/03), 847 So.2d 1255, *cert. denied*, 540 U.S. 1185, 124 S.Ct.

1404 (2004). "Where there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency." *Id.* at 626.

### Summary of the Trial Evidence

Cierra Barker is the daughter of Defendant and the victim, John Barker. Cierra called 911 on September 6, 2021, because "I think my dad is gonna try to kill my mom." When asked if her father was armed, Cierra told the 911 operator that her mother was a security guard and had her gun, although her father "might have taken" it. Cierra explained that her parents were outside on the porch and that her address was 454 Seventh Avenue, Krotz Springs, Louisiana. The 911 operator then alerted local law enforcement. When the operator asked Cierra to confirm whether her father had the gun, Cierra responded "yes." She then said her mother was trying to break up with her father, and her father did not want the breakup.

Six minutes into the conversation, Cierra stated that she believed law enforcement had just arrived. Eight seconds later, a gunshot is heard in the background. And during the six seconds that followed, four more shots are heard. Cierra screamed. She then began to sob. Asked what the sound was, Cierra said she did not know. When asked if she could see anything outside, Cierra stated she could not because the windows were covered by curtains, which were nailed in place. Cierra then informed the operator that she was nineteen years old and the only person in the house. Roughly a minute later, a police officer knocked on the door. The call ended at that point.

Dr. Christopher Tape performed the autopsy of the victim. He was accepted as an expert in the field of forensic pathology. He testified that he "recovered five bullets from the body" of the victim. And although there were seven entry wounds

3

on the body, two of the bullets went through the victim's right arm before hitting his torso, whereas the other three were directly to the torso. Dr. Tape testified that he recovered all five bullets from the victim's right side, noting that four of them hit the victim's right lung and the fifth hit his liver. According to Dr. Tape, the trajectory of all five bullets was "right to left, front to back and downward." However, Dr. Tape acknowledged that he could not say what position the victim was in when he was shot, whether sitting, crouching, or standing.

The State then called fire chief Timothy Guidry of the Saint Landry Fire District. According to Chief Guidry, he and his partner were about one mile from the crime scene when they were notified of the shooting. Upon arrival, Chief Guidry checked with Defendant to see if she was shot. He then proceeded to the porch to check on the victim. When asked for his assessment of the victim, the chief explained:

> He was partially faced down, laying on his left side and we really couldn't tell anything so we had to roll him over and pull him out of the corner. And then once we got him over, there were no breath sound, [sic] no rise and fall of the chest, no pulse, and from the amount of blood that was on the porch, it was a lot of blood loss. With no life signs we made the decision at that point that there was - - - he had been down for quite a while and determining with the loss of blood, there was no reviving.

Chief Guidry also noticed multiple gunshot wounds "to the center chest area." He then turned his attention to Defendant, bringing her to the back of an ambulance to treat her wounds. And while doing so, he noticed "several cuts to the face and the chest." The chief described the cuts on Defendant's face as superficial with dried blood. As to the cuts to Defendant's chest area, he estimated that one-half of them were perhaps a quarter inch deep; he also noticed that the blood on Defendant's chest had dried.

4

According to the chief, Defendant stated that the victim had cut her with a box cutter and choked her with a belt. But no box cutter was found outside the home, whether on the porch or anywhere else. And the chief did not notice any marks or bruises on Defendant's neck. Also at that time, Defendant stated that the victim had taken her gun "and fired one shot in the air and then she got it back from him and that's whenever she shot him."

The State's next witness was Detective Amber Robin of the Krotz Springs Police Department. Detective Robin testified that on September 6, 2021, she was on call beginning around 4:30 a.m. She was dispatched to 454 Seventh Street just before 6:00 a.m. in response to a female caller who reported that she believed her father was going to kill her mother and that her father had her mother's gun. Four minutes later, Detective Robin arrived at the scene. As the detective drove up to the house, she saw Defendant standing on the porch a few feet away from the victim, who was sitting. Defendant then appeared to look toward the detective. At that point, the detective did not observe the victim and Defendant arguing nor did she "see any kind of disturbance going on."

According to Detective Robin, although it was dark outside, the porch light was turned on, and the spotlight from her vehicle was shining on the porch. The detective recalled that the victim was sitting with his back to her looking down as she began walking toward the porch. All this is confirmed by the detective's body-camera footage, which began as she exited her vehicle at 6:03:57 a.m.

Six seconds into the video, the first shot was fired on the porch. Detective Robin immediately took cover. And by the eleven-second mark, all five shots had been fired. Detective Robin radioed for backup. She then began yelling at the victim to drop the gun. Next, she ordered Defendant to exit the porch with her hands behind

her back. Defendant, in turn, made her way to the detective, mumbling and making it difficult to understand what she was saying. Detective Robin—still working under the assumption that the victim had the gun and fired the shots—radioed that the victim was still on the porch with the firearm and not responding to commands.

When a backup officer arrived, Detective Robin conveyed to that officer that the victim had fired "three or four shots" as she was getting out of her vehicle. That officer then began yelling at the victim to surrender. At this point, Detective Robin asked Defendant where the victim got the gun. In response, Defendant told her that the victim had fired one shot into the air, then she got the gun, "turned it around, and shot him." Defendant claimed she was not aiming; she was just firing while "trying to get away from him." Detective Robin and the other officer approached the porch slowly, finally realizing that the victim was down on the porch, bleeding out. Detective Robin then spotted the gun at the opposite side of the porch.

Next, Detective Robin walked back to Defendant and asked whether she had been shot. Defendant responded, "No, he just beat the shit out of me." Defendant said that the victim had come over the night before. She told him to leave because he started beating her. He refused. He then told her that he was going to sleep and that they could go their "separate ways" in the morning. As Detective Robin headed back to the porch, paramedics informed her that the victim was dead. Chief Guidry then approached the detective and informed her that the victim was shot five times "that [he] could see."

Thereafter, Detective Robin entered the residence to speak with Cierra. Cierra stated that her parents were arguing because her mother was trying to break up with her father, "again." Cierra stated that while her parents argued on the porch, she locked the front door and called 911. She said she was afraid her father might come

6

inside and hurt her. When asked if she saw who had the gun first, Cierra shook her head "no" but then stated she "thought [her dad] did."

Detective Robin testified that Defendant's firearm was ultimately found on top of the outdoor dryer situated on the porch. Although Defendant and Cierra both made statements on the body camera footage that Defendant had a restraining order against the victim, Detective Robin clarified that there was no active restraining order at the time of the shooting.

Detective Robin was also the evidence custodian for the Krotz Springs Police Department. She confirmed that five shots were fired shortly after she arrived at the scene. She also confirmed that five bullets were recovered from the victim's body. And while only four shell casings were recovered, the detective explained that the soil near the porch was soaking wet because it started raining shortly after the shooting. She surmised that the missing casing might have been lost in the mud.

Detective Robin then identified the box cutter that Defendant claimed the victim had used to attack her. The box cutter was found inside the house in a tool bag near the back door. Detective Robin also identified photographs taken of Defendant at Opelousas General Hospital several hours after the shooting. They showed several small cuts to Defendant's left cheek, a small cut on the right side of her face, and several cuts on her chest.

Detective Robin was then asked about the holster on Defendant's utility belt, which Defendant was wearing at the time of the shooting. The detective was familiar with that type of holster, so she demonstrated for the jury how it worked, explaining:

> This one which would have been on [Defendant], would have been on her left side at the time, which you would have to place your hand on the gun here and there's an inside trigger, which you press, which pops this lever. At that time, there's an outside button which you must press, hold and pull the gun out at the same time.

The jurors were then allowed to handle the holster to see exactly how it functioned, though without the firearm.

On cross-examination, Detective Robin testified that she believed Defendant saw her approaching as she arrived at the scene in her vehicle. The detective explained that her emergency lights were not activated to avoid escalating the reported domestic disturbance. According to Detective Robin, when she asked Defendant where the victim was located—though still operating under the belief that he was armed—Defendant pointed to the corner or the porch, which is where the victim was ultimately found dead. And although the detective recalled Defendant dropping her duty belt when ordered to exit the porch, the detective did not see Defendant place the firearm on the outdoor dryer, which is where the gun was later found. Detective Robin then confirmed that the victim had previously been convicted in Iowa of domestic abuse assault (of his then-wife, Defendant) and child endangerment (of his daughter, Cierra), and that he received a two-year prison sentence for each charge.

The State's next witness was Jill Moore, a forensic scientist with the St. Tammany Parish Sheriff's Office Crime Lab. Ms. Moore had been a forensic scientist for fourteen years and had worked on several hundred gunshot residue analyses. The trial court accepted Ms. Moore "as an expert in Forensic Science with a specialized [knowledge] in gunshot residue analysis." Ms. Moore testified that the swabs taken from the hands of Defendant and the victim contained gunshot residue particles. According to Ms. Moore, both individuals either fired a firearm, were within four to six feet of a discharged firearm, or touched a recently discharged firearm. Yet she could not say which scenario had occurred. She did note that it was not unusual to find gunshot residue on a gunshot victim.

The State's next witness was Detective Frank Garcia, a twenty-six-year veteran of the Louisiana State Police. Detective Garcia was accepted by the court as an expert in digital forensic analysis. Detective Garcia testified that he examined two cellphones in this case: one belonged to Defendant; the other belonged to the victim. Detective Garcia then discussed the extraction reports generated during his analysis of each phone.

As to Defendant's phone, Detective Garcia noted calls to a contact named "Cierra daughter" at 7:13 a.m. and 9:06 a.m. on September 6, 2021, which was the morning of the shooting. There was also an incoming call from a contact named "John" on September 5, 2021, at 7:45 p.m. John is the victim. Additionally, there were three calls within six minutes between "John" and Defendant, beginning 7:30 a.m. on September 5, 2021. The first two were initiated by Defendant's phone, and the third was initiated by "John."

Detective Garcia then went through numerous text messages recovered from Defendant's phone. Specifically, he looked at the messages between Defendant and "John" during the days leading up to the shooting. For the most part, those messages reflected a loving relationship. But then on the morning of September 6, from 12:30 a.m. to 12:34 a.m., the following text-message exchange occurred: Defendant stated, "[A]fter you eat you steak leave"; "[I] dont want you here anymore[.]" Seconds later, "John" responded with two text messages. The first reads: "Do you think I care[?]" And the second: "I will be here as long as I want[.]" Immediately thereafter, Defendant sent these texts: "[I] dont want you near [C]ierra or me ever again"; and "we are done[.]" "John" responded, "If you continue to tell me what to do you will regret it[.]" Defendant replied, "[J]ust leave us alone[.]" To this, "John" stated: "I leave you alone but Cierra will leave you as well[.]" Defendant responded, "[L]eave

9

her out of this[.]" Then two final texts were then sent from "John": "Then shut up and never tell me what to do again"; and "[i]f you don't you'll regret it dearly."

Detective Garcia explained that the repeated delays of less than twenty seconds between messages were unusually short, especially considering that each person needed to receive and read each message before typing and sending a response. Also, less than one hour before the above exchange, Defendant sent Cierra the following text message: "[W]hat[']s on the cards[?]" Cierra responded, "I need the pin or his ss." The messages between mother and daughter were sent at 11:40 p.m. on September 5.

Detective Garcia then turned his attention to the victim's cellphone. The detective confirmed it was the same number listed as "John" in Defendant's phone. The detective also confirmed that the contact "Margaret" in the victim's phone was the same number associated with Defendant's phone. The detective testified that on September 5, 2021, at roughly 8:32 p.m., the victim's phone made a twenty-seven-minute call to Mary Jane Higdon. At 10:40 p.m., there was a second call to Ms. Higdon, which lasted about eight minutes.

Next, Detective Garcia noted that at 11:12 p.m. that same evening, the victim's phone sent the following text message to the contact "nall jana": "I'm at Margaret's tonight's she told me she wants to break up can u believe that shit I'm pissed." Twenty minutes later, a similar text message was sent to "Crawford Carman": "I am so pissed right now [M]argaret said she is leaving me again I'm pissed and getting madder by the min."

The State's next witness was Chelsee Richardson, a firearms examiner at the Louisiana State Police Crime Lab. Ms. Richardson was accepted by the court as an expert in the field of firearms examination. She testified that all shell casings

10

recovered from the crime scene were fired from the same Glock 9mm pistol, which was also recovered from the scene.

The State then called Angela Maher, a DNA analyst at the Louisiana State Police Crime Lab. Ms. Maher was accepted as an expert in the field of DNA analysis. According to Ms. Maher, she tested DNA obtained from the recovered box cutter and the firearm against known samples from Defendant, the victim, and Cierra. Ms. Maher testified that neither of the swabs taken from the box cutter contained enough DNA to draw any conclusions. Similarly, there was not enough DNA on the swab taken from the firearm to draw any conclusions.

The State's next witness was Mary Jane Higdon Brown, who had been friends with the victim since high school. Ms. Brown testified that she communicated with the victim daily, typically by phone call and sometimes by text messaging. Ms. Brown confirmed that the number saved in the victim's phone as "Mary Jane Higdon" was her phone. She acknowledged having a nearly thirty-minute conversation with the victim on September 5, 2021. She explained that this call occurred while the victim was driving home from Baton Rouge.

But according to Ms. Brown, the phone call that she received from the victim's phone at 10:40 p.m. was not from the victim; it was from Defendant. Ms. Brown recalled that Defendant asked her for help, claiming that the victim was "was incoherent, and it was [sic] something wrong." Defendant mentioned COVID-19, noting that she scheduled an appointment for the victim at a walk-in clinic for the following morning at 10:00. Defendant also said that she and the victim were planning to remarry. Thus, as Defendant put it: "[Y]a'll don't have to take care of him anymore, I will take care of him for you." Ms. Brown testified that this eight-minute call was the only time she ever spoke to Defendant on the phone.

11

The State's next witness was the victim's sister, Carmen Crawford. According to Ms. Crawford, the victim came to her house for a visit on September 5, 2021. She and the victim had a close relationship, and she would typically speak with him at least once per day.

Ms. Crawford confirmed that the "Crawford Carmen" contact in the victim's phone was her phone number. She then discussed receiving a strange text message from the victim's phone shortly before midnight on September 5, 2021. She did not see the message until the next day because she was asleep. Yet according to Ms. Crawford, the message was strange because she and her brother never discussed his relationship with Defendant, because the message used "I am" instead of "I'm," and because it abbreviated the word "minute."

The State then called Janna Nall Leininger, a childhood friend of the victim's. Ms. Leininger testified that on the morning of September 6, 2021, she, too, awoke to a missed text from the victim's phone. She confirmed the "Janna Nall" contact was her phone number. Ms. Leininger then recalled that in the text message, the victim said he was pissed that Defendant wanted to break up again. Also in the message, the victim referred to Defendant as "sexy." Like Ms. Crawford, Ms. Leininger testified that the way the message was written seemed odd because the victim never used contractions. So it should have been "I am," not "I'm."

The State's next witness was Chief Wanda Sue Snyder of the Krotz Springs Police Department. Chief Snyder testified that she had been in law enforcement since 1977, that she was the Krotz Springs Chief of Police from 1995 to 2011, and that she was reelected to that position in 2015. From 2012 until her reelection as chief, she worked as a detective in Avoyelles Parish. Chief Snyder testified that on September 6, 2021, she was out of town when she was notified of a domestic dispute

12

at Defendant's residence, of shots being fired, and of a person being shot and killed. The chief recalled that she arrived back at the police station around 2:00 that afternoon.

According to Chief Snyder, Detective Robin was already interviewing Defendant when she arrived at the station. After that interview ended, the chief accompanied Detective Robin back to the crime scene to look for the missing shell casing. Chief Snyder testified about her observations of the crime scene. She identified photographs that she had taken of the porch area, particularly the bench where the victim had been sitting. She explained that the bench was very low to the ground. Thus, she did not believe that a man as large as the victim, who was 340 pounds, could have posed as a threat to Defendant while he was seated on the bench (or trying to get up from the bench).

The State then asked Chief Snyder to demonstrate her understanding of what happened with the gun when it was in the holster, to which defense counsel objected based on speculation. Defense counsel also argued that the lead investigator, Detective Robin, had already given an in-depth demonstration. The objection was overruled.

Although Chief Snyder admitted that she was not familiar with the specific holster at issue, she testified they are "all basically pretty similar." During her demonstration, she testified that the victim could not have pulled the gun from Defendant's holster given his position on the bench. As the chief put it:

> That's impossible. Cause you have to push on the side. There's no way I can get it with my little hands. Cause you have to push and then you have to pull up. I have to do it with - - - there's no way I can do it. Cause you will have to push and then pull. This way.

13

According to Chief Snyder, Defendant previously stated that the victim was sitting on the bench and smoking a cigarette prior to going for the gun and that he was crouching when she shot him. And when asked about Detective Robin's body camera footage, the chief acknowledged that it was impossible to see either Defendant or the victim when the five gunshots were fired. The trial court then recessed for the day.

Yet prior to reconvening the following morning, the trial court informed the attorneys that it found Chief Snyder's "demonstration problematic and I'm going to order the jury to disregard the demonstration." Part of the problem, according to the trial court, was Chief Snyder's repeated use of "impossible" to describe Defendant's version of events. Also problematic were the chief's comments that she was much smaller than the victim. Hence, the trial court felt "that the demonstration was not a reliable recreation of the alleged event." The court then summed it up this way: "I think that the prejudicial effect of the demonstration outweighs it[s] probative value and that's really the real reason for it. The thing that drives me the most is that, I don't know what we learned from that demonstration." But defense counsel neither objected nor asked for a mistrial after the trial court stated its intention to instruct the jury to disregard the chief's demonstration.

The State then called Cierra. Cierra began by explaining that she had trouble remembering September 5 and 6, 2021. In her words, "It was a few years ago." But Cierra did remember that her mother cooked barbeque on September 5 and that her father came over that evening. Cierra lived with her mother in Krotz Springs, and her father lived in Washington, Louisiana. According to Cierra, her mother had been working as a security guard for about eighteen months, though her current job was new.

14

The State then introduced into evidence Cierra's recorded interview, which was conducted by Detective Robin. The interview is divided into three parts. Part one began with Cierra stating that she was doing an all-night movie marathon on September 5, 2021. Then, the following morning, she tried waking her mother at 5:00, as her mother had requested. According to Cierra, her mother woke up, got dressed, and left the house for work. Her father then woke up and made his way to the living room. At that point, her mother reentered the home; she had apparently forgotten her car keys. Cierra recalled that her father then followed her mother outside to the front porch.

According to Cierra, her mother had been planning to break up with her father. Cierra guessed her mother did just that outside because she heard her father yelling. This is when Cierra called 911. Cierra said that her father "apparently" grabbed her mother's gun and aimed it at her mother.

Cierra then backtracked to the night before the shooting. Cierra explained that her parents went to bed while she stayed up to watch movies. She explained that her mother woke up a short while later and was doing something on her phone. When her mother went back to bed, Cierra looked through her mother's phone and saw text messages between her parents. In these messages, her mother expressed to her father that their relationship was over.

Cierra then turned her attention back to the morning of the shooting. Cierra claimed that while her parents were yelling at each other on the porch, she could not understand what her father was saying. Cierra stated that she never saw her father with a gun in his hand. Yet she claimed that she saw her mother's silhouette with her hands up, saying "Don't shoot!"

15

Cierra then talked about the 2016 incident in Iowa, which led to her father spending time in jail. Cierra explained that her father tried to kill them: she and her mother. She also talked about an incident in which her father smashed the windshield of her mother's car. This happened, according to Cierra, when her mother tried leaving him early in their marriage. Cierra noted that her parents were married for about twenty-five years prior to the incident in Iowa. They divorced after that.

Cierra's interview then shifted back to the events leading up to the shooting. According to Cierra, her mother typically left her gun in the holster on her duty belt, which she typically left on a desk near the living room couch. She stated that when her mother went outside, she was wearing her duty belt.

Cierra also stated that her parents were not arguing prior to going outside. When asked whether they argued the night before, Cierra was uncertain, though she did not recall any fighting inside the house. Cierra then claimed that she heard "clothes ripping, and grunting" when her parents were outside on the porch, but this was after she had locked the door. But when asked how she could hear that, she claimed opening the door slightly to hear what was happening.

Cierra then shifted directions, recalling that her father had previously asked her mother to go with him to a friend's house. Her mother returned with two red handprints on her face. When asked about being honest, Cierra admitted that she may have added some parts to her story.

Part two of the interview began with Detective Robin talking to Cierra about being completely honest. Cierra then explained that her mother wanted her to stay with a cousin on the day before the shooting. But Cierra did not know why.

16

Cierra then began retelling her story, reiterating that her mother woke up a few hours after going to bed, came back into the living room, and then sent a text on her phone. The following morning, according to Cierra, her mother got dressed, went outside, then came back in for her keys. Her father then followed her mother back outside, which is when they began arguing. Cierra again stated that she saw her mother's silhouette with her hands up. But this time Cierra claimed hearing gunshots immediately after seeing her mother's silhouette. She was unsure how many shots were fired.

Cierra then backtracked. According to Cierra, her father called her mother before coming to the house on September 5, 2021. Her mother, in turn, hung up quickly with a "scared look on her face." Yet Cierra stated that she had asked her father to come help her with something on September 4, but he did not show up until around 8:00 p.m. on September 5.

Cierra then revisited what had happened the following morning. She stated that her mother got dressed in the living room, then went outside, but then returned for her keys. Next, her father followed her mother outside, which is when they began arguing. Cierra claimed that while she was on the phone with 911, she could hear the arguing getting louder, so she went to the window and pulled back the curtain, just a bit, at which point she saw her father with her mother's gun. She claimed it was at this point that she locked the door. Again, she claimed seeing her mother's silhouette with her arms up, though she said it was "a few minutes later" when she heard gunshots. When asked if she noticed anything out of the ordinary about either of her parents that morning, she stated that her mother was walking stiffly. But she reiterated being unaware of any argument between her parents before the argument on the porch.

17

In the third part of the interview, Cierra recalled seeing the silhouette of her mother with her hands up. Detective Robin then informed Cierra that her mother's hands were up because the detective was yelling at her to get off the porch. Cierra did not respond.

### Sufficiency of the Evidence

On appeal, Defendant does not assert that the State failed to prove any element of second degree murder.[1] Instead, she asserts that the State failed to disprove her defense of justifiable homicide. This defense was addressed in *State v. Burton*, 19-1079, p. 4 (La. 6/30/21), 320 So.3d 1117, 1120:

> A homicide is justifiable when it is "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). When justification is raised by the accused, the State must prove beyond a reasonable doubt that the crime was not committed in self-defense.

Thus, at trial, a defendant who pleads justification (or self-defense) in a homicide case does not have any burden of proof; the state must prove beyond a reasonable doubt that the death was not in self-defense. *Id*. And when a defendant challenges the sufficiency of the evidence on appeal, the standard of review is whether any rational juror, viewing the evidence in the light most favorable to the prosecution, could have found that the homicide was not committed in self-defense. *State v. Perkins*, 527 So.2d 48 (La.App. 3 Cir.1988).

Here, Defendant claims that her former husband took her gun out of its holster, aimed it at her, then fired a shot into the air, all before she was able to disarm him,

---

[1] Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]"

gain control of the gun, and then shoot him while trying to get away. The jury rejected this story, and so do we.

At the outset, the jury simply did not believe the testimony of Defendant's daughter, Cierra. After all, during her interview with Detective Robin, Cierra initially stated that she never saw her father with a gun; she just thought he had one. But later, Cierra said she did see her father with a gun. And although Cierra told the 911 operator that her father had Defendant's gun, she later said she could not see outside because of the curtains over the windows, which were nailed in place.

Also during her interview with Detective Robin, Cierra claimed that she had opened the door to hear what her parents were saying, even though she previously told the 911 operator that she would not unlock the door. Cierra also stated in her interview that she saw the silhouette of her mother with her hands up just before shots were fired. But this is contradicted by Detective Robin's testimony.

Additionally, Chief Snyder noted at trial that the victim was significantly larger than Defendant. Thus, if there had been a struggle for the gun after the victim allegedly fired a shot, there would have been a pause between the shot allegedly fired by the victim and the five fatal shots fired by Defendant. But there was no pause: all five shots were discharged within six seconds. This is evidenced by the 911 call. It is also evidenced by Detective Robin's body camera footage. The evidence shows that only five shots were fired, and all five bullets were recovered from the victim's dead body. There is simply no way to reconcile the evidence with Defendant's story that the victim fired a shot before Defendant took the gun from him and killed him.

But there is more. Defendant admitted that when she began shooting the victim, he was no longer armed. She had the gun, and the box cutter allegedly used

19

by the victim to cut her was ultimately found inside the house, well beyond the victim's reach on the porch. Yet she nevertheless shot him five times, causing his death.

As a matter of law, a homicide is only justifiable if the defendant reasonably believes deadly force "is necessary to save" herself. La.R.S. 14:20(A). For example, in *State v. Stevenson*, 514 So.2d 651, 655 (La.App. 2 Cir. 1987), *writ denied*, 519 So.2d 141 (La.1988), the second circuit rejected the defendant's claim of self-defense, noting that any "justification was removed when the defendant immediately disarmed the victim." In that case, the victim was the initial aggressor and armed himself with a stick. But the defendant quickly wrestled the stick away and then beat the victim to death.

Likewise, Defendant here admits that she disarmed the victim before shooting him. In addition, Detective Robin had already arrived at the scene and was approaching Cierra's parents when the shots were fired. Although defense counsel at trial contested whether Defendant would have known that Detective Robin was a police officer—because her emergency vehicle lights were not turned on—it is clear from the 911 call that Cierra, who was inside the house with limited ability to see outside, was aware that law enforcement had arrived before the shooting occurred. All this made it unreasonable for Defendant to shoot the victim.

In the alternative, Defendant argues that she should have been convicted of the lesser included verdict of manslaughter. Manslaughter is defined by La.R.S. 14:31(A)(1), which states:

> A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to

20

manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

"While 'sudden passion' and 'heat of blood' are mitigating factors to a charge of murder, an accused need only establish the mitigating factors by a preponderance of the evidence." *State v. Johnson*, 06-1263, p. 14 (La.App. 3 Cir. 2/7/07), 948 So.2d 1229, 1237, *writs denied*, 07-467, 07-509 (La. 10/12/07), 965 So.2d 398, 399. And on appeal, "an appellate court must determine whether a rational trier of fact, upon reviewing the evidence in the light most favorable to the prosecution, could have found that the mitigating factors had not been established by a preponderance of the evidence." *State v. Watson*, 15-392, p. 4 (La. App. 3 Cir. 10/7/15), 175 So.3d 1192, 1196, *writ denied*, 15-2046 (La. 11/7/16), 208 So.3d 897.

Here, Defendant contends that she and the victim were in the "midst of a heated argument." That argument, according to Cierra, began when her parents were outside on the porch. But "an argument alone is not sufficient provocation to support a verdict of manslaughter." *State v. Johnson*, 06-623, p. 11 (La.App. 3 Cir. 11/2/06), 941 So.2d 696, 704, *writ denied*, 06-3024 (La. 9/14/07), 963 So.2d 995.

However, Defendant further contends that the victim choked her with a belt and attacked her with a box cutter. Chief Guidry, though, saw no marks or bruising on Defendant's neck. And while Defendant had some minor cuts and scratches on her face and chest, Chief Guidry noted that the wounds were mostly shallow and that the box cutter allegedly used to cause those injuries was inside the home in a tool bag and had no DNA on it, either from Defendant or the victim.

Defendant also continues to rely on her claim that the victim fired a shot into the air immediately before she took the gun from him and shot him. As previously addressed, this story is implausible. There were only five shots. And all five bullets

21

were recovered from the victim's dead body. There is no evidence that the victim did anything before being shot, other than yell at his armed ex-wife.

In summary, Defendant's first assignment of error is based on unsupported allegations, not record evidence. Since Defendant does not contend that the State failed to prove any element of second degree murder, since there is scant evidence of self-defense, and since there is even less evidence of the mitigation factors for manslaughter, it is easy to see that this assignment cannot survive *Jackson*, 99 S.Ct. 2781.

In other words, when viewing the evidence in the light most favorable to the prosecution, a rational juror could have found that the State proved beyond a reasonable doubt that Defendant was guilty of second degree murder and that the homicide was not committed in self-defense. And in viewing the evidence in this same light, a rational juror could have found that the mitigating factors had not been established by a preponderance of the evidence.

Defendant's first assignment is therefore without merit.

## III. Defendant's Second Assignment of Error

As a matter of convenience, Defendant's second assignment of error is reproduced below:

> The trial court erred in overruling the defense's objection to a demonstration by Krotz Springs Chief of Police of a duty belt worn by [Defendant] at the time of the shooting, and, in later finding that although the prejudicial effect of the demonstration outweighed its probative value, an instruction to the jury to disregard both the demonstration as well as opinion testimony given by the Chief of Police was sufficient to cure any harm caused to [Defendant].

Oversimplifying slightly, Chief Snyder demonstrated why she felt it was impossible for the victim to have removed the gun from Defendant's holster, over

defense counsel's objection. The next morning, the trial court instructed the jury as follows:

> Good morning. I'm going to let y'all know as I just let the attorneys know, we might be here late today. So, I'm sure y'all understand that. Before we start this morning, I want to call your attention briefly to our last witness yesterday; Chief Susie Snyder from Krotz Springs. It's my job as judge to decide what facts the jury should consider or actually that's not true. It's my job to decide what evidence the jury should not consider. After consultation with the attorneys, I've informed them that I'm instructing you not to consider the demonstration that was held right her[e] in front of me with the holster yesterday afternoon. Y'all have had [a] chance to examine the holster. And the other thing that I'm instructing you not to do is to consider any testimony that Chief Snyder gave wherein she said, in my opinion. There are certain rules for when opinion evidence can be expressed and should be considered. So, with that in mind those two things [sic]. Y'all are not to consider the demonstration that was had yesterday or any testimony that Chief Snyder gave that she stated was her opinion. Does everyone understand that?

Defendant contends that the demonstration should never have been allowed. More specifically, Defendant argues that the trial court erred in initially denying the objection because "the demonstration was so prejudicial" that it denied her "a fair trial" and that this defect could not be cured by the trial court's instruction to disregard the demonstration. We disagree.

Aside from the admonition given to the jury, the only other avenue of relief for Defendant would have been a mistrial. The mandatory grounds for a mistrial are set forth in La.Code Crim.P. art. 770:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

23

(3) The failure of the defendant to testify in his own defense; or

(4) The refusal of the judge to direct a verdict.

An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

Because the demonstration made by Chief Snyder does not fit into any of these categories, a mistrial would be governed by La.Code Crim.P. art. 775:

A mistrial may be ordered, and in a jury case the jury dismissed, when:

(1) The defendant consents thereto;

(2) The jury is unable to agree upon a verdict;

(3) There is a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law;

(4) The court finds that the defendant does not have the mental capacity to proceed;

(5) It is physically impossible to proceed with the trial in conformity with law; or

(6) False statements of a juror on voir dire prevent a fair trial.

Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.

A mistrial shall be ordered, and in a jury case the jury dismissed, when the state and the defendant jointly move for a mistrial.

Admonitions to the jury, meanwhile, are addressed by La.Code Crim.P. art. 771, which states:

In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

(1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

(2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

Although Defendant is correct that her attorney initially objected to the demonstration, defense counsel at no point thereafter sought a mistrial, even after the court admonished the jury. Nor did counsel object or express to the trial court that the admonishment was insufficient to cure any prejudice. Yet now on appeal, Defendant contends that the "prejudice was too great to be cured by an instruction to ignore the Chief of Police's demonstration and comments about her opinion."

In our view, the situation presented is not "a legal defect in the proceedings which would make any judgment entered upon a verdict reversible as a matter of law." La.Code Crim.P. art. 775(3). But even still, defense counsel did not move for a mistrial. And while Article 775 has a catchall clause for "when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial," that clause also requires a motion for mistrial.

For these reasons, Defendant's second assignment of error is also without merit.

## DISPOSITION

Defendant's conviction and sentence are affirmed. This matter is remanded to the trial court for the correction of the sentencing minutes and the Uniform Commitment Order. Specifically, the trial court is ordered to amend the minutes and

commitment order to reflect that Defendant's sentence was imposed without benefit of parole, probation, or suspension of sentence.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**